# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PAUL KAHAN,                                    )
                                               )
        Plaintiff,                     )
                                               )
                                               )
                                               )
      v.                             )      Civil Action No.  12-407
                                               )
SLIPPERY ROCK UNIVERSITY OF                    )
  PENNSYVANIA, EVA TSUQUIASHI-                 )
  DADDESIO, JOHN CRAIG,                        )
  CHARLENE WINSLOW, THOMAS                     )
  [E.] WINSLOW, SR., THOMAS [M.]               )
  WINSLOW, JR.,                                )
                                               )
        Defendants.                    )
                                               )
                                               )

## MEMORANDUM OPINION

**CONTI, Chief District Judge**

        This is a civil rights, employment, and common law tort case in which Paul Kahan ( "Kahan") accuses his former employer, Slippery Rock University ("SRU"), several of its individual employees, and the husband and son of one of its employees, of wrongfully either failing to renew his teaching contract, or causing that contract not to be renewed.  Under federal law, Kahan asserts gender-based discrimination, retaliation, and hostile work environment claims pursuant to 42 U.S.C. §§ 2000e – 2000e-17 ("Title VII"), and 20 U.S.C. § 1681 ("Title IX"), and constitutional claims under 42 U.S.C. § 1983, alleging violations of his equal protection, free speech, and due process rights.  Kahan additionally asserts companion employment discrimination claims under the Pennsylvania Human Relations Act, 43 Pa. Stat. § 951 – 963 (the "PHRA"), and Pennsylvania common law claims of promissory estoppel, intentional

interference with contract, and malicious prosecution, as well as a statutory defamation claim pursuant to 42 Pa. Cons. Stat. § 8341. Kahan seeks injunctive and declaratory relief, compensatory and punitive damages, back and front pay, attorneys' fees, and all other available damages.

SRU, and its co-defendant employees, filed a motion for summary judgment (ECF No. 77.) The co-defendant employees are: (1) Eva Tsuquiashi-Daddesio, Interim Dean of SRU's College of Humanities, Fine and Performing Arts ("Dean Tsuquiashi-Daddesio"); (2) John Craig, Chairman of SRU's History Department ("Craig"); and (3) Charlene Winslow, SRU's History Department's secretary ("Mrs. Winslow"), (collectively, with SRU, the "SRU Defendants" and collectively, but without SRU, the "Individual SRU Defendants"). The SRU Defendants filed a brief in support of their motion, (ECF No. 78), a concise statement of material facts, (ECF No. 79), an appendix, (ECF No. 80), and a response to Kahan's counterstatement of material facts, (ECF No. 116). Separate motions for summary judgment, and supporting briefs, statements of fact, appendices, and responses to Kahan's counterstatement of material facts, were filed by Thomas E. Winslow, (ECF Nos. 81-84, and 118), and Thomas M. Winslow, (ECF No. 85-88, and 119). Thomas E. Winslow is Mrs. Winslow's husband and will be referred to throughout this opinion as "Mr. Winslow." Thomas M. Winslow is Mr. and Mrs. Winslow's son, and was a student at SRU during the pertinent time period. He will be referred to throughout this opinion as "Tommy Winslow."

In response to each of the three motions for summary judgment, Kahan filed an opposition brief, appendices, and a statement of material facts that both responded to each movant's concise statement of material facts and included a separate counterstatement of material facts. (ECF Nos. 99-101, 103-05, 107-09.) After the close of briefing, the parties

submitted joint concise statements of material facts for each of the three respective summary judgment motions. (ECF Nos. 120-22.)

       For the reasons that follow in this memorandum opinion, judgment will be entered against Kahan on each of his federal claims. Because no claim that arises under federal law survives summary judgment, this court declines to exercise supplemental jurisdiction over the Pennsylvania common law and statutory claims. Those claims will be dismissed, without prejudice to Kahan's right to raise them in state court.

## I.    <u>FACTUAL BACKGROUND</u>

       All material facts set forth herein are undisputed unless otherwise indicated. Additional material facts may be discussed elsewhere in this memorandum opinion, in context. Because three separate motions for summary judgment are pending, there are three separate combined concise statements of material fact. The combined concise statement of material facts related to the SRU Defendants' motion for summary judgment, which is docketed at ECF No. 122, will be referred to in the format "ECF No. 122, SRU CCSMF ¶ x." The combined concise statement of material facts related to Mr. Winslow's motion for summary judgment, which is docketed at ECF No. 120, will be referred to in the format "ECF No. 120, Mr. Winslow CCSMF ¶ x." The combined concise statement of material facts related to Tommy Winslow's motion for summary judgment, which is docketed at ECF No. 121, will be referred to in the format "ECF No. 121, Tommy Winslow CCSMF ¶ x."

## A. Kahan's Employment with SRU

### 1. Non-Renewal of Kahan's One-Year Contract

Kahan was selected for the position of Assistant Professor in SRU's Department of History in February 2009. (ECF No. 122, SRU CCSMF ¶ 1.) The chairman of the history department, Craig, did not concur with the majority vote of the department, and preferred to hire a different candidate, Daniel Barr, who is also a male. (ECF No. 122, SRU CCSMF ¶¶ 30, 70; ECF No. 80-5 at 2 (Craig memo).) Kahan was hired to replace a male professor. (ECF No. 122, SRU CCSMF ¶¶ 1, 69.) Kahan's notice of appointment indicated that he would begin teaching in August 2009, and was a probationary, tenure-track professor whose one-year contract was subject to renewal based upon various conditions, including adherence to the terms of the Collective Bargaining Agreement between the Association of Pennsylvania State College and University Faculties and the Pennsylvania State System of Higher Education (the "CBA"). (ECF No. 122, SRU CCSMF ¶¶ 1-2, 31; ECF No. 80-1 at 43-58 (CBA); ECF No. 80-1 at 40-41 (offer letter and appointment notice).)

Decisions with respect to renewal of probationary teaching contracts, such as Kahan's contract, were based upon evaluations and recommendations made by the history department's evaluation committee, the history department's chairman, the dean of the college of humanities, and the provost and president of SRU. (ECF No. 122, SRU CCSMF ¶¶ 3, 21, 33.) Kahan was entitled to written notice of SRU's decision with respect to renewal of his one-year contract no later than April 1, 2010. (ECF No. 80-1 at 56-57 (CBA, Art. 14, §A(4)(a)(1)).) Article 12 of the CBA sets forth the standards to be applied when evaluating probationary professors. (ECF No. 122, SRU CCSMF ¶¶ 3, 32; ECF No. 80-1 at 56 (CBA, Art. 14, §A(3)).) The first evaluation criterion is "effective teaching and fulfillment of professional

responsibilities," the latter of which includes submitting grades and reports in a timely fashion, and attending faculty meetings. (ECF No. 122, SRU CCSMF ¶ 4; ECF No. 80-1 at 48 (CBA, Art. 12, §B(1)).)  The other two evaluation criteria are "continued scholarly growth" and "service contributions to SRU or the community." (ECF No. 80-1 at 48-49 (CBA, Art. 14 §B(2) and (3)).)

On February 1, 2010, Craig, as chair of the history department, completed a performance review report, in which he favorably commented on Kahan's performance in all three areas of evaluation. (ECF No. 80-3 at 18-20 (Craig report); ECF No. 122, SRU CCSMF ¶ 22.)  Craig's report ultimately concluded that Kahan's contract should be renewed. (Id.)  On February 8, 2010, the history department evaluation committee completed its performance review report, in which it evaluated Kahan in the areas of service, scholarship, and teaching. (ECF No. 80-3 at 14-16 (committee report); ECF No. 122, SRU CCSMF ¶ 22.)  The committee's report was also favorable to Kahan, while noting the recommendation was "tentative" and "preliminary" because Kahan had been teaching at SRU for less than six months at the time of its submission. (ECF No. 80-3 at 15 (committee report); ECF No. 122, SRU CCSMF ¶ 22.)  Based upon these two reports, and supporting materials submitted by Kahan, Dean Tsuquiashi-Daddesio recommended renewal of Kahan's one-year probationary teaching contract in a letter to Kahan dated March 2, 2010. (ECF No. 80-3 at 22 (Dean's letter).)  On that same date, Dean Tsuquiashi-Daddesio notified Dr. William Williams, provost and vice president for academic affairs ("Provost Williams"), of her favorable recommendation. (ECF No. 80-3 at 23 (Dean memo).)

Three days later, on March 5, 2010, SRU's academic records office sent a memorandum to Dean Tsuquiashi-Daddesio notifying her that Kahan was the only faculty member within her college who failed to submit spring 2010 semester mid-term grades by the March 4, 2010 deadline. (ECF No. 80-3 at 37 (memo); ECF No. 122, SRU CCSMF ¶ 12.) Dean Tsuquiashi-Daddesio had not received a similar memorandum from the academic records office concerning Kahan's submission of mid-term grades for the fall 2009 semester, but came to learn in March 2010 that Kahan only met that deadline because an academic records office staff member, who called Kahan to inform him that his grades were late, agreed to input Kahan's grades into the computer system on his behalf if he faxed them to the academic records office. (ECF No. 122, SRU CCSMF ¶¶ 7, 141; ECF No. 101-4 at 46-47 (Craig draft memo); ECF No. 101-13 (Kahan decl.) ¶ 28.) March 5, 2010 was the last day that SRU was in session before spring break. (ECF No. 122, SRU CCSMF ¶ 13.) Craig and Dean Tsuquiashi-Daddesio spoke about Kahan's tardy submission of mid-term grades, and other performance problems, on Monday, March 15, 2010, the day that classes resumed at SRU following spring break. (ECF No. 122, SRU CCSMF ¶¶ 13-15, 125.) Craig orally informed Dean Tsuquiashi-Daddesio on March 15, 2010, that he no longer supported renewal of Kahan's one-year contract. (ECF No. 122, SRU CCSMF ¶ 125.)

Following this conversation, Craig sent a draft memorandum to Dean Tsuquiashi-Daddesio, on March 18, 2010, in which he summarized Kahan's late submission of grades, as well as other deadlines and meetings that Kahan missed during his first year teaching at SRU. (ECF No. 101-4 at 46-47 (Craig draft memo); ECF No. 122, SRU CCSMF ¶ 127.) Craig's draft memorandum, which was revised and sent to Dean Tsuquiashi-Daddesio in final form on March 19, 2010, indicated that Craig no longer recommended renewal of Kahan's contract based upon

Kahan's "pattern of neglect" in "repeatedly ignoring deadlines during his initial year of employment." (ECF No. 80-3 at 28-29 (Craig final memo); ECF No. 122, SRU CCSMF ¶ 26.) The March 18, 2010 draft memorandum differs from the March 19, 2010 final memorandum in various respects, including that Craig removed a statement that Kahan's behavior "seems to reveal incompetence, a lack of responsibility, arrogance, and other personality issues that collectively explain his inattention to required duties." (Compare ECF Nos. 101-4 at 46-47 (Craig draft memo) and 80-3 at 28-29 (Craig final memo).) Craig notified the chair of the history department's evaluation committee about his revised recommendation, and the reasons for it, in a memorandum dated March 23, 2010. (ECF No. 105-2 at 45 (Craig memo).)

Dean Tsuquiashi-Daddesio spoke with Provost Williams by telephone on or around March 23, 2010, to notify him that she no longer supported the renewal of Kahan's one-year probationary teaching contract, and to explain why she changed her recommendation. (ECF No. 122, SRU CCSMF ¶ 167.) Following this conversation, Provost Williams notified Dr. Robert M. Smith, President of SRU ("President Smith"), in a memorandum dated March 23, 2010, that he was not recommending renewal of Kahan's contract. (ECF Nos. 80-3 at 33 (Williams memo) and 101-5 at 21 (Williams email); ECF No. 122, SRU CCSMF ¶¶ 40-41, 164-65, 167.) Dean Tsuquiashi-Daddesio memorialized her withdrawal of support for Kahan's renewal, and the reasons for it, in a memorandum to Provost Williams, dated March 25, 2010. (ECF No. 80-3 at 31 (Dean memo); ECF No. 122, SRU CCSMF ¶¶ 40, 160.) President Smith notified Kahan by letter dated March 30, 2010, that SRU would not renew his contract for the 2010-2011 academic year, and that his appointment would expire on June 4, 2010. (ECF No. 80-3 at 35 (Smith letter); ECF No. 122, SRU CCSMF ¶ 41.) Pursuant to the CBA, Kahan was

entitled to receive notice of SRU's decision with respect to renewal of his contract no later than April 1, 2010. (ECF No. 80-1 at 56 (CBA, Art. 14, §A(4)(a)(1)).)

Craig met with Kahan, in person, on March 23, 2010, to discuss Kahan's performance problems and to inform Kahan that Craig no longer supported renewal of his contract. (ECF No. 122, SRU CCSMF ¶ 15; ECF No. 105-2 at 45 (Craig memo); ECF No. 109-3 at 39 (Craig email); ECF No. 80-3 at 40 (Kahan memo) (indicating date of meeting with Craig as March 22, 2010).)  Craig provided Kahan a copy of the memorandum that he sent to the history department's evaluation committee, which was dated March 23, 2010, on the same day that they met. (ECF No. 105-2 at 45 (Craig memo); ECF No. 109-3 at 39 (Craig email).)  According to Kahan, he never received a copy of the draft or final memoranda that Craig sent to Dean Tsuquiashi-Daddesio on March 18 and 19, 2010. (ECF No. 122, SRU CCSMF ¶ 37.)

Kahan first learned that Dean Tsuquiashi-Daddesio no longer supported renewal of his contract during a previously-scheduled March 25, 2010 meeting. (ECF No. 122, SRU CCSMF ¶ 168.)  At this meeting, Dean Tsuquiashi-Daddesio showed Kahan a draft of her March 25, 2010 memorandum to Provost Williams, which was dated March 23, 2010, but refused to give Kahan a copy of it. (ECF No. 122, SRU CCSMF ¶ 168-69.)  This draft version of Dean Tsuquiashi-Daddesio's memorandum included a reference to a complaint letter that Mrs. Winslow submitted to Craig about Kahan; however, the final version of Dean Tsuquiashi-Daddesio's memorandum does not include this reference. (Compare ECF Nos. 101-5 at 4 (Dean draft memo) and 80-3 at 31 (Dean final memo); ECF No. 122, SRU CCSMF ¶ 160; ECF No. 80-3 at 47-48 (Mrs. Winslow complaint letter).)  Kahan is copied on the final version of Dean Tsuquiashi-Daddesio's March 25, 2010 memorandum. (ECF No. 80-3 at 31 (Dean final memo).)

Dean Tsuquiashi-Daddesio, Craig, and the history department evaluation committee provided Kahan with opportunities to discuss the evaluations and recommendations before President Smith issued his final non-renewal decision on March 30, 2010. (ECF No. 122, SRU CCSMF ¶ 42.) In particular, Kahan submitted a memorandum to Provost Williams, dated March 28, 2010, in direct rebuttal to Dean Tsuquiashi-Daddesio's March 25, 2010 memorandum to Provost Williams, and met or personally spoke with Provost Williams at least twice between March 29, 2010 and April 5, 2010. (ECF No. 122, SRU CCSMF ¶¶ 42, 172-73; ECF No. 80-3 at 39-42 (Kahan memo); ECF No. 101-5 at 21 (Kahan email).) Kahan also appeared before the history department's evaluation committee on March 29, 2010 to plead his case. (ECF No. 122, SRU CCSMF ¶¶ 38, 172-73; ECF Nos. 80-3 at 25-26 (committee memo).)

The evaluation committee submitted a memorandum to Provost Williams, dated March 30, 2010, in which it confirmed its original recommendation in favor of renewal of Kahan's contract, "but with reservations in light of his noted mistakes." (ECF No. 80-3 at 25-26 (committee memo).) Craig sent a memorandum to Dean Tsuquiashi-Daddesio the following day, March 31, 2010, in which he stated that he hoped the evaluation committee's recommendation would receive "careful consideration," but that he remained personally opposed to renewal of Kahan's contract. (ECF No. 101-5 at 18 (Kahan memo).) Kahan asked Dean Tsuquiashi-Daddesio, by email dated March 31, 2010, if she would reconsider her recommendation that his contract not be renewed in light of the evaluation committee's continued support of his renewal, but Tsuquiashi-Daddesio refused to do so because the committee "added 'with reservations' to its original recommendation" and Craig notified her that he remained opposed to renewal. (ECF No. 101-5 at 20 (Kahan-Dean emails).) When Kahan emailed Craig on April 1, 2010, about

Craig's refusal to support renewal of his contract, Craig responded that "it was your decision to seek and secure adjunct work and then miss deadlines on the very days you were committed to [Westmoreland County Community College] in Latrobe that caused this mess. You did this to yourself. You treated a difficult full time job as a part-time one." (ECF No. 101-5 at 19 (Craig-Kahan emails).)

Kahan, pursuant to his limited grievance rights as a first-year, probationary non-tenured faculty member, filed a grievance challenging the non-renewal of his contract. (ECF No. 122, SRU CCSMF ¶¶ 5-6, 36, 43; ECF No. 80-4 at 4 (Kahan grievance).) Kahan's grievance was denied on May 11, 2010, because Kahan's grievance rights were limited, by the CBA, to SRU's failure to provide timely notice of non-renewal, and Kahan received notice of his non-renewal before the April 1, 2010 deadline. (ECF No. 122, SRU CCSMF ¶ 35; ECF No. 80-4 at 2 (grievance response).)

Kahan acknowledges that he "was in fact tardy turning in [his] midterm grades in both the fall and spring semesters" and characterizes the error as "a serious failure on [his] part" in the rebuttal memorandum he sent to Provost Williams on March 28, 2010. (ECF No. 80-3 at 39-41 (Kahan memo).) Kahan also admits that he did not attend a faculty meeting in January 2010, without giving advance notice to the department chairman of his absence, (ECF No. 122, SRU CCSMF ¶ 9), and submitted his attendance reports, referred to as "salmon-colored sheets," five days late in February 2010, (id. ¶ 8). Although Kahan acknowledges these deficiencies, he claims that his contract was not renewed because Craig supported the hiring of Daniel Barr, when Kahan was hired in 2009, and because Kahan complained to Craig about Mrs. Winslow bring rude to him and about being pressured to give her son extra time on an assignment and a passing grade in his class. (ECF No. 120, Mr. Winslow CCSMF ¶ 25; ECF No. 122, SRU

CCSMF ¶¶ 28-30.)  Kahan similarly contends that Dean Tsuquiashi-Daddesio reversed her

decision to support renewal of his contract "based on Ms. Winslow's complaints about Kahan."

(ECF No. 122, SRU CCSMF ¶ 40.)

## 2. Kahan's 2011 Application for Employment

In 2011, Kahan applied for the faculty position in SRU's history department that

was created when his contract was not renewed in 2010. (ECF No. 122, SRU CCSMF ¶ 56.)

Kahan's position was not filled during the 2010-2011 academic year, and the classes that would

have been taught by Kahan that year, were instead taught by a female faculty member. (Id. ¶ 61.)

More than 130 applications were received for the open faculty position in 2011. (Id.)  Kahan was

not one of the three applicants selected by the search committee for an on-campus interview. (Id.

¶ 57.)  SRU hired a male for the position. (Id. ¶ 61; ECF No. 80-4 (William Bergmann offer

letter).)

Prior to submitting his application, Kahan filed a charge of gender discrimination

and retaliation with the Equal Employment Opportunity Commission ("EEOC"). (Id. ¶ 59.)

Kahan's only evidence that the search committee was aware of Kahan's EEOC charge is an

incongruent citation to Craig's deposition acknowledging that the head of the search committee

notified him, at some indeterminate time, that Kahan applied for the vacancy, and an email from

Kahan's former colleague, Aaron Cowan, refusing to allow Kahan to use his recommendation

letter to apply for the job at SRU because Cowan was serving on the search committee and

because, in Cowan's personal opinion, if Kahan were hired, there would be continued conflict

between Kahan and the administration. (ECF No. 122, SRU CCSMF ¶ 60; ECF No. 101-10 at 35

(Cowan email).)

**B. Conflicts with Mrs. Winslow**

According to Kahan, Craig recommended that Kahan's contract not be renewed in order to placate Mrs. Winslow, with whom Kahan had various personal and professional conflicts, because Craig did not want the history department's secretary to quit, resulting in an increase to his own workload. (ECF No. 100 (Kahan brief) at 4-5; ECF No. 122, SRU CCSMF ¶¶ 29-30.) Kahan similarly contends that Dean Tsuquiashi-Daddesio did not support renewal of his contract because Mrs. Winslow complained about him. (ECF No. 122, SRU CCSMF ¶ 40.) There is no dispute on this record that Mrs. Winslow did not want SRU to hire Kahan in 2009, thought Kahan was "weird" when he interviewed on campus at that time, and came to personally dislike Kahan after he was hired. (ECF No. 120, Mr. Winslow CCSMF ¶¶ 74-79; ECF No. 121, Tommy Winslow CCSMF ¶¶ 55-60.)

**1. Tommy's Final Report**

Tommy Winslow was a student in Kahan's 400-level Pennsylvania history class during the fall 2009 semester. (ECF No. 122, SRU CCSMF ¶ 44.) Tommy Winslow, who was diagnosed with attention deficit disorder at the age of nine, was registered with SRU's Office for Students with Disabilities, which intervened in December 2009, after Kahan initially refused to grant Tommy an extension of time for the submission of his final report. (ECF No. 120, Mr. Winslow CCSMF ¶ 46-47; ECF No. 122, SRU CCSMF ¶¶ 45-46; ECF No. 101-11 at 23-24 (Mrs. Winslow depo. at 93-94).) Tommy Winslow was eventually granted an extension and his final grade was reported as an incomplete, pending submission of his final report. (ECF No. 122, SRU CCSMF ¶¶ 45-46.) According to Kahan, at the beginning of the spring 2010 semester, Craig pressured Kahan to give Tommy Winslow a final grade of D, even though Kahan's and a

fellow faculty member's grading of his final report justified a final grade of F. (Id. ¶¶ 47-49, 98.)
Kahan claims that his resistance to doing so resulted in hostility between Kahan and Craig and
Kahan and Mrs. Winslow. (Id.)

Tommy Winslow told Mrs. Winslow that Kahan initially refused to grant him an
extension on his final report in mid-December 2009. (Id. ¶ 83.)  Mrs. Winslow contacted Linda
Quidone, Director of the Office for Students with Disabilities ("Quidone"), to secure an
extension on behalf of her son. (Id. ¶ 89.)  Mrs. Winslow was dissatisfied when an extension of
less than a day was offered, at which time Mr. Winslow became involved by contacting the
Office for Students with Disabilities, which referred Mr. Winslow to Holly McCoy, the Assistant
Vice President of Diversity and Equal Opportunity ("McCoy"), when he inquired about how he
could go about filing a complaint based upon Kahan's refusal to give Tommy Winslow more
time to submit his final report. (ECF No. 101-11 at 34 (Mrs. Winslow depo. at 149); ECF No.
80-3 at 47-48 (Mrs. Winslow complaint letter); ECF No. 120, Mr. Winslow CCSMF ¶¶ 48-49,
57, 59.)  After these contacts, Tommy Winslow was granted an extension of approximately one
week, with which Mr. and Mrs. Winslow were satisfied. (ECF No. 80-3 at 47-48 (Mrs. Winslow
complaint letter); ECF No. 120, Mr. Winslow CCSMF ¶ 62; ECF No. 122, SRU CCSMF ¶ 97.)

Prior to these communications, Tommy Winslow complained to his parents about
Kahan's classroom demeanor, and detailed for them that one day, when Tommy was staring out
the window during a class session, Kahan asked him whether he was looking at a good-looking
man, and then stated that the comment was not meant to be made in a sexual manner, causing the
class to laugh at him. (ECF No. 120, Mr. Winslow CCSMF ¶¶ 98, 100-04; ECF No. 121,
Tommy Winslow CCSMF ¶¶ 23, 50, 86, 88.)  Mr. and Mrs. Winslow relayed this information to
Quidone and McCoy while attempting to secure an extension of time for their son's final report.

(ECF No. 120, Mr. Winslow CCSMF ¶¶ 24, 39-41, 43.)  Mrs. Winslow told Dean Tsuquiashi-Daddesio about the "good-looking man" comment during a March 19, 2010 meeting regarding Kahan. (ECF No. 120, Mr. Winslow CCSMF ¶ 86; ECF No. 121, Tommy Winslow CCSMF ¶ 86.)  Mrs. Winslow also wrote a letter of complaint to Craig, dated March 21, 2010, regarding Kahan's poor treatment of her son, including specifically Kahan's failure to initially grant him an extension of time in conformance with the Americans with Disabilities Act, 42 U.S.C. § 12101-12117 (the "ADA"). (ECF No. 80-3 at 47-48 (Mrs. Winslow complaint letter).)  Mrs. Winslow's letter generally accuses Kahan of "harass[ing]" and "target[ing]" Tommy Winslow because of his disability, specifically discusses the steps taken to obtain an extension of time for his final report in December 2009, and references Mrs. and Mr. Winslow's interest, at that time, in filing a complaint under the ADA, but does not mention the "good-looking man" comment or make any reference to or allegation of sexual harassment. (Id.)

According to Kahan, Quidone informed him during a December 2009 telephone call about the extension for Tommy Winslow that Mr. Winslow threatened to sue Kahan and SRU for sexual harassment based upon the "good-looking man" comment. (ECF No. 120, Mr. Winslow CCSMF ¶¶ 24, 39-41, 43.)  Both Quidone and Mr. Winslow dispute this fact and testify in conformity with the other that Mr. Winslow asked only how he could file a complaint based upon Kahan's refusal to grant Tommy a reasonable accommodation under the ADA. (ECF No. 120, Mr. Winslow CCSMF ¶¶ 50-51, 53.)  This matter will be addressed in section III.A.2(b).

## 2.  **The Scantron Sheets**

Kahan and Craig met on March 15, 2010, the first day that SRU was in session following spring break, to address concerns that Kahan raised with Craig via emails dated March 3, 2010, and March 12, 2010, with respect to Mrs. Winslow's refusal to order certain testing supplies, called scantron sheets, for Kahan. (ECF No. 80-3 at 43 and 45 (Kahan emails); ECF No. 117-1 at 73 (Craig depo. at 166); ECF No. 122, SRU CCSMF ¶¶ 13, 24-25, 117-18.)  During this meeting, Kahan informed Craig that Mrs. Winslow had been rude to him since the dispute concerning the deadline for Tommy Winslow's final report arose in December 2009.  (ECF No. 117-1 at 69 (Craig depo. at 162).)  Craig instructed Kahan to order supplies directly from him, instead of Mrs. Winslow, in the future. (ECF No. 117-1 at 69-70, 75-76 (Craig depo. at 162-63, 167-69).)

After speaking with Kahan about the conflict concerning the scantron sheets, Craig spoke with Mrs. Winslow about the matter. (ECF No. 117-1 at 68-71 (Craig depo. at 161-64).)  Mrs. Winslow's account of the conversation that she had with Kahan about ordering scantron sheets essentially matched Kahan's account, with the primary exception being that Mrs. Winslow claimed that Kahan was the one being rude to her. (Id. at 68-71, 78-80 (Craig depo. at 161-64, 171-73).)  Craig also spoke with Dean Tsuquiashi-Daddesio about the matter on March 15, 2010, in order to obtain her approval of his instruction to Kahan that he not approach Mrs. Winslow directly to order supplies for the present time, and to discuss Kahan's missed deadlines. (Id. at 75 (Craig depo. at 167); ECF No. 122, SRU CCSMF ¶ 125.)

### 3. The March 21, 2010 Complaint Letter

Mrs. Winslow met with Dean Tsuquiashi-Daddesio on March 19, 2010, at the Dean's request, to discuss problems that her son Tommy Winslow had with Kahan during the fall 2009 semester. (ECF No. 122, SRU CCSMF ¶ 156.) Mrs. Winslow told the Dean that Kahan targeted, harassed, embarrassed, and humiliated her son during class, and specifically recounted the "good-looking man" comment. (Id. ¶ 157.) Following this meeting, which was on a Friday, Mrs. Winslow drafted a letter, dated Sunday, March 21, 2010, and addressed to Craig, in which she summarized her complaints about how her son, Tommy Winslow, was treated in Kahan's history class the previous semester. (ECF No. 80-3 at 47-48 (Mrs. Winslow complaint letter); ECF No. 122, SRU CCSMF ¶ 159.)

By way of chronological context, Dean Tsuquiashi-Daddesio and Craig discussed Kahan's failure to submit his mid-term grades in a timely manner on March 15, 2010, at which time Craig informed Dean Tsuquiashi-Daddesio that he no longer supported renewal of Kahan's contract. (ECF No. 122, SRU CCSMF ¶¶ 13-15, 125.) Craig submitted a draft memorandum to Dean Tsuquiashi-Daddesio about Kahan on March 18, 2010, and a final memorandum to her on March 19, 2010. (ECF No. 101-4 at 46-47 (Craig draft memo); ECF No. 80-3 at 28-29 (Craig final memo).) Dean Tsuquiashi-Daddesio spoke with Provost Williams about Kahan on March 23, 2010, at which time the Dean had begun to draft a memorandum to Provost Williams about Kahan. (ECF No. 101-5 at 2-4 (Dean draft memo).) Craig informed Kahan that he no longer supported renewal of his contract on either March 22 or 23, 2010. (ECF No. 122, SRU CCSMF ¶ 15; ECF No. 105-2 at 45 (Craig memo); ECF No. 109-3 at 39 (Craig email); ECF No. 80-3 at 40 (Kahan memo).) Dean Tsuquiashi-Daddesio informed Kahan that she no longer supported the renewal of his contract on March 25, 2010. (ECF No. 122, SRU CCSMF ¶ 168.) Kahan received

notice from President Smith on March 30, 2010, that his one-year probationary teaching contract would not be renewed. (ECF No. 80-3 at 35 (Smith letter); ECF No. 122, SRU CCSMF ¶41.)

### 4. The May 18, 2010 Incident

On May 18, 2010, Mrs. Winslow reported an incident to SRU campus police during which Kahan allegedly entered her office, called her a "bitch," called Tommy Winslow a "retard," wished them both to "die a painful death," threw a DVD toward her, and said "now put this away." (ECF No. 122, SRU CCSMF ¶ 50; ECF No. 105-3 at 3-4 (Mrs. Winslow's SRU police voluntary statement form).) When Dean Tsuquiashi-Daddesio's secretary, Amy McCamey, called Mrs. Winslow's office shortly after this incident occurred to finalize previously-made lunch plans, Mrs. Winslow relayed the incident to her. (ECF No. 122, SRU CCSMF ¶ 190.) Ms. McCamey spoke with the Dean about the incident and relayed to Mrs. Winslow that the Dean stated that Mrs. Winslow should report the incident to campus police if she felt threatened or unsafe, which she did. (Id. ¶¶ 63, 190.) The SRU police spoke with Kahan and Craig about the incident the following day. (Id. ¶¶ 64; ECF No. 80-5 at 34-35 (SRU incident report form).) Kahan denied making any such statements, and instead claimed that, while he was cleaning out his office, he asked Mrs. Winslow to put a DVD away for him, which was part of her job duties. (ECF No. 80-5 at 35 (SRU incident report form); ECF No. 122, SRU CCSMF ¶¶ 51, 189.) During his interview, Craig indicated that he felt harassed by Kahan, and gave the SRU police officer a copy of an email from Kahan, dated May 17, 2010, in which Kahan called Craig a "liar," a "coward," "incompetent," and "petty, vindictive and completely dishonest." (ECF No. 80-5 at 34-35 (SRU incident report form); ECF No. 80-4 at 12 (Kahan email); ECF No. 122, SRU CCSMF ¶ 64.)

Kahan contends that after this incident, he was instructed, by letter, not to return to the SRU campus without prior approval. (ECF No. 122, SRU CCSMF ¶ 201.) Kahan fails to include this letter, which he labels "Ex. 97" in his response to SRU's CCSMF ¶ 201, in his appendix, and the court was unable to locate the document elsewhere in the record. (ECF No. 101 at 2 (appendix table of contents); ECF No. 101-4 to -8 (plaintiff's exhibits).) In the summary judgment papers, Kahan contends not that he was required to obtain an escort in order to visit campus, but that he was required to obtain "SRU's express permission" before returning to campus after the May 18, 2010 incident. (ECF No. 122, SRU's CCSMF ¶ 201.) Without access to the letter, the court is unable to determine which directive Kahan was given. Notably, defendants deny the averment in Kahan's second amended complaint that "SRU barred Dr. Kahan from entering onto campus without an escort" after the May 18, 2010 incident. (ECF Nos. 53, 54, and 64 ¶ 70.)

The SRU campus police filed a criminal complaint for harassment against Kahan at the office of Magistrate Shaffer in Slippery Rock, Pennsylvania on May 20, 2010. (ECF No. 122, SRU CCSMF ¶ 64.) A preliminary hearing was held on the charge on September 14, 2010, at which time the presiding judge noted an administrative error in the paperwork, not caused by any SRU Defendant, and held the matter over for further instructions. (Id. ¶¶ 54, 65-67.) SRU police refiled the charge in October 2010, to remedy the error, but the Butler County District Attorney later advised the charging officer that the case would not be pursued. (Id. ¶¶ 55, 68.)

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the record shows that there is no genuine dispute with respect to any material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment.  Only a dispute over a material fact – that is, a fact that would affect the outcome of the suit under the governing substantive law – will preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Even then, the dispute over the material fact must be genuine, such that a reasonable jury could resolve it in the nonmoving party's favor.  Id. at 248-49.

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts, in favor of the nonmoving party.  Liberty Lobby, 477 U.S. at 255; Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007); Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001); Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001); Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999).  A court must not engage in credibility determinations at the summary judgment stage.  Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir. 1998).

One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The summary judgment inquiry asks whether there is a need for trial – "whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Liberty Lobby, 477 U.S. at 250.  In ruling on a motion for summary judgment, the court's function is not to weigh the evidence or to

determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150–51 (2000) (citing decisions); Liberty Lobby, 477 U.S. at 248-49.

The burden of showing that no genuine issue of material fact exists rests initially on the party moving for summary judgment. Celotex, 477 U.S. at 323; Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996). The moving party may satisfy its burden either by producing evidence showing the absence of a genuine issue of material fact or by demonstrating that there is an absence of evidence to support the nonmoving party's case. Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (citing Celotex, 477 U.S. at 325). A defendant who moves for summary judgment is not required to refute every essential element of the plaintiff's claim; rather, the defendant must only point out the absence or insufficiency of plaintiff's evidence offered in support of one or more those elements. Celotex, 477 U.S. at 322-23. Once the movant meets that burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial" and to present sufficient evidence demonstrating that there is indeed a genuine and material factual dispute for a jury to decide. Fed. R. Civ. P. 56(e); see Liberty Lobby, 477 U.S. at 247-48; Celotex, 477 U.S. at 323-25. If the evidence the nonmovant produces is "merely colorable, or is not significantly probative," the moving party is entitled to judgment as a matter of law. Liberty Lobby, 477 U.S. at 249.

The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). To survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and

on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

Furthermore, "[w]hen opposing summary judgment, the non-movant may not rest upon mere

allegations, but rather must 'identify those facts of record which would contradict the facts

identified by the movant.'" Corliss v. Varner, 247 F.App'x 353, 354 (3d Cir. 2007) (quoting Port

Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)).

## III.    DISCUSSION

### A.  The Employment Claims

In his second amended complaint, Kahan asserts four claims under Title VII and

two claims under Title IX.  Kahan alleges that the SRU Defendants engaged in gender

discrimination and created a gender-based hostile work environment, in violation of both Title

VII and Title IX. (ECF No. 53 at Counts I-IV.[1]) Kahan additionally accuses the SRU Defendants

of violating Title VII by retaliating against him. (Id. at Counts XVI-XVII.)

As an initial matter, although the parties provided the court with copies of the

charge of discrimination that Kahan filed with the EEOC, (ECF No. 80-4 at 6-10), the court was

unable to locate a right-to-sue letter in the record.  The receipt of the right-to-sue letter indicates

that a complainant has exhausted administrative remedies, which is an essential element for

bringing a claim in court under Title VII. Burgh v. Borough Council of Borough of Montrose,

251 F.3d 465, 470 (3d Cir. 2001); see Stampone v. Freeman Decorating Co., 196 F.App'x 123,

126 (3d Cir. 2006) ("In the absence of a right-to-sue letter, a Title VII suit can be dismissed for

failure to state a claim upon which relief may be granted.").  In his second amended complaint,

---

[1] Kahan also asserts companion claims pursuant to the PHRA. (ECF No. 53 at Counts X and XI.)
Although such claims are substantively coterminous with claims brought pursuant to Title VII,
because this court is dismissing the remaining state law claims without prejudice to Kahan's
right to pursue them in state court, in the interest of consistency, the court will not enter
judgment on the PHRA claims. Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 317 n.3
(3d Cir. 2000); Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).

Kahan alleges that he received a right-to-sue letter from the "Civil Rights Division of the U.S. Department of Justice" on or about January 3, 2012, but the letter is not attached to that pleading either. (ECF No. 53 ¶ 16.)  Mr. Winslow and Tommy Winslow deny Kahan's allegation about the right-to-sue letter based upon a lack of knowledge, (ECF No. 64 ¶ 16), and the SRU Defendants respond that the "document speaks for itself," (ECF No. 54 ¶ 16.)  No defendant challenges Kahan's Title VII claims on this jurisdictional basis in its summary judgment papers, and, therefore, the court will accept as true, for the purpose of deciding the instant motion, Kahan's averment that he properly administratively exhausted his claims before proceeding in federal court.

    1.  <u>**Gender Discrimination Claims (Counts I and III)**</u>

SRU moves for summary judgment on Kahan's gender discrimination claims on the ground that Kahan cannot establish a <u>prima</u> <u>facie</u> case, and that even if he could, he is unable to prove that SRU's reasons for not renewing his one-year contract were a pretext for gender discrimination. (ECF No. 78 (SRU brief) at 11-12.)  In response, Kahan alleges that SRU engaged in gender discrimination, in violation of both Title VII and Title IX, by not renewing his contract after one year, and by filing criminal charges against him based upon the "gender stereotype of the aggressive and hostile male" and "hyper-masculine rage-based language." (ECF No. 100 (Kahan brief) at 14-15.)   For the reasons set forth below, none of Kahan's Title VII or Title IX gender discrimination claims survives summary judgment.

As an initial matter, it remains an open issue in this jurisdiction, and there is a split of authority elsewhere, with respect to whether a public employee can bring a cumulative Title IX gender discrimination claim based upon the same conduct that supports a Title VII gender discrimination claim. <u>Torres v. Sch. Dist. of Manatee Cnty., Fla.</u>, 14-1021, 2014 WL

4185364, at * 5-6 (M.D. Fl. Aug. 22, 2014) (collecting decisions). This court need not answer this question, however, because there is no dispute that, if duplicate claims can be pursued, the same analytical framework applies to gender discrimination claims brought pursuant to either statute. Tingley-Kelley v. Trustees of Univ. of Pa., 677 F.Supp.2d 764, 775 (E.D. Pa. 2010) (citing decisions). A distinction typically arises between these claims only when a plaintiff has failed to exhaust his or her administrative remedies, as required by Title VII, but not by Title IX, prior to filing suit. As discussed above, however, this court is presuming for the purpose of deciding the instant motion that Kahan received a right-to-sue letter, and can pursue a Title VII claim in federal court. See supra III.A. In this case, therefore, there is no relevant distinction between Kahan's Title VII and Title IX gender discrimination claims, and they will be considered together, with no further distinction made in this opinion.

Although neither party acknowledges this principle, because Kahan is a male, his claim is one for "reverse discrimination." All that is required to establish a prima facie case in such circumstances is evidence permitting a fact finder to conclude that the employer is treating some people less favorably than other people, based upon gender. Iadimarco v. Runyon, 190 F.3d 151, 161 (3d Cir. 1999); see Besko v. New Jersey Juvenile Justice Comm'n, 558 F.App'x 295, 298 (3d Cir. 2014) (applying Iadimarco and finding that all that is required to establish a prima facie case of reverse discrimination is a sufficient showing that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII.) Once this showing is made, the employer must proffer a legitimate, nondiscriminatory reason for the employment action. Iadimarco, 190 F.3d at 157-58 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)); see Goosby, 228 F.3d at 319.

In order to defeat summary judgment the employee must then point to some evidence, direct or circumstantial, from which a fact-finder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating cause of the employer's action. Iadimarco, 190 F.3d at 157-58; Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). Put another way, to avoid summary judgment, the employee's evidence must allow a fact-finder to reasonably infer that the employer's proffered nondiscriminatory reason was either a post hoc fabrication, or otherwise did not actually motivate the employment action. Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 370 (3d Cir. 2008).

### a. Adverse Employment Action

Before proceeding, the court must address Kahan's conclusory allegations that both the non-renewal of his contract, and Mrs. Winslow's report to the SRU campus police about the May 18, 2010 incident, were gender-based adverse employment actions. An adverse employment action requires "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998).

There can be no reasonable dispute that the non-renewal of Kahan's one-year, probationary contract qualifies as an adverse employment action. Kahan's brief is silent, however, with respect to how Mrs. Winslow's report about the May 18, 2010 incident, and the resulting criminal charges themselves, caused a "significant change in employment status, responsibilities, or benefits." Burlington, 524 U.S. at 761. While there can be no reasonable dispute that being accused of and criminally charged with assault is an adverse *event*, Kahan has

not explained how that event resulted in an adverse *employment action*. At the time of the May 18, 2010 incident, Kahan had already received notice that his contract would not be renewed.

The court's independent review of the record indicates that the only possible connection between Mrs. Winslow's report about the May 18, 2010 incident and the terms and conditions of Kahan's employment is Kahan's assertion that he was not permitted to be on the SRU campus without permission or an escort because of the incident. (ECF No. 122, SRU CCSMF ¶ 201 (prior permission required); ECF No. 53 ¶ 70 (escort required).) As set forth in section I.B.4., the letter purportedly notifying Kahan about these conditions is not attached to Kahan's summary judgment papers, and defendants deny the averment in Kahan's second amended complaint that such conditions were placed on Kahan after the incident. (ECF No. 101 at 2 (appendix table of contents); ECF No. 101-4 to -8 (plaintiff's exhibits); ECF Nos. 53, 54, and 64 ¶ 70.) Although there is no evidentiary support for Kahan's assertion, the court will accept it as true only for the purpose of deciding the instant motion.

Even accepting Kahan's allegation as true, it would not support a reasonable jury finding that Kahan suffered an adverse employment action as a result of Mrs. Winslow's May 18, 2010 report to the SRU campus police. By Kahan's own recitation of the content of the letter, he was permitted to visit campus provided that certain conditions were met. (ECF No. 122, SRU CCSMF ¶ 201 (prior permission required); ECF No. 53 ¶ 70 (escort required).) Kahan submits no evidence, and fails to even allege, that he wanted, or needed, to return to campus after May 18, 2010, but was prevented from doing so because of either alleged directive. Kahan submits no evidence to establish that the classes he taught in the spring 2010 semester were still in session, or that he had other professional responsibilities that could only be fulfilled by visiting campus. The record is devoid of any indication that Kahan was unable to do his job

because he was required to either seek prior approval to be on campus, or to obtain an escort, or both. Based upon these facts, no reasonable jury could conclude that the directive that Kahan not return to the SRU campus without prior permission or an escort was a significant change in employment status, responsibilities, or benefits, thus qualifying it as an adverse employment action.

Because, however, the non-renewal of Kahan's contract does qualify as an adverse employment action, and because Kahan's employment discrimination claims cannot survive summary judgment on the alternative grounds discussed below, Kahan's failure to establish that Mrs. Winslow's report to the SRU campus police about the May 18, 2010 incident was a gender-based adverse employment action is ultimately inconsequential. The deficiency, therefore, will not be discussed further in this opinion.

### b. The *Prima Facie* Case

According to Kahan, he can establish a prima facie case of gender discrimination because he was the "target of gender stereotyping as the overly masculine alpha male in a reserved academic setting." (ECF No. 100 (Kahan brief) at 12.) Kahan notes that a female faculty member, Rhea Klenovich ("Klenovich"), was treated more favorably than he was because she did not have to share her office, as did Kahan, and she taught the classes that Kahan planned to teach during the 2010-2011 academic year. (Id. at 15; ECF No. 122, SRU CCSMF ¶ 212.) The court considers Kahan's contentions in reverse order, but concludes that neither satisfies Kahan's burden to prove that SRU treated males less favorably than females. Iadimarco, 190 F.3d at 161.

### (i) **Comparator – Klenovich**

The comparison to Klenovich cannot satisfy Kahan's burden to prove a prima facie case of gender discrimination. As an initial matter, Kahan failed to produce evidence indicating whether Klenovich was a probationary faculty member, or if she was, in which year of her probationary term she was during the 2009-2010 academic year. The record is devoid of any evidence about what Klenovich's job title or duties were, to whom she reported, or her seniority at SRU. The entirety of Kahan's evidence with respect to Klenovich is a single statement, in his own declaration, that Klenovich was a "lower ranked female faculty member." (ECF No. 122, SRU CCSMF ¶ 212.) Without further information, or corroboration, which would have been readily available in discovery, the court cannot assess whether Klenovich was a similarly situated employee to Kahan. (ECF No. 101-13 (Kahan decl.) at 3-4); Wilcher v. Postmaster General, 441 F.App'x 879, 882 (3d Cir. 2011); Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 366 (3d Cir. 2008); Mun. Revenue Services, Inc. v. McBlain, 347 F.App'x 817, 825 (3d Cir. 2009) (finding that comparators must be alike, but not identical, in all relevant respects); Borrell v. Bloomsburg Univ., No. 12-2123, 2013 WL 3287147, at *12 (M.D. Pa. Jun. 28, 2013) (similar).

The record is likewise devoid of any evidence that would permit the court to evaluate whether the circumstances under which Kahan was assigned an office at SRU indicate discriminatory treatment on the basis of gender. The isolated and conclusory fact that Kahan was required to share an office, but Klenovich was not, does not indicate a gender bias. In fact, by Kahan's own account, no other faculty member, male or female, was required to share an office other than Kahan, indicating that SRU assigned faculty offices based upon variables other than gender. (ECF No. 122, SRU CCSMF ¶ 212.) According to Kahan's own factual averments, no reasonable jury could infer that SRU treated females more favorably than males based upon

how faculty officers were assigned, or that Kahan received a less favorable office assignment because he is male.

Likewise, the fact that Klenovich taught the classes that Kahan was scheduled to teach during the 2010-2011 academic year gives rise to no inference of gender bias. (Id. ¶ 61.) This female faculty member was not hired to fill the teaching vacancy created when Kahan's contract was not renewed; instead, a male was hired into that position. (Id.) Klenovich was only tasked with teaching Kahan's classes during the 2010-2011 academic year, until a new professor could be hired for the 2011-2012 academic year. (Id.) As noted above, although Kahan asserts that Klenovich was "less qualified with a lower degree," he fails to submit any evidence to support that bare allegation. (ECF No. 100 (Kahan brief) at 15.) This evidentiary deficiency is without consequence, however, because Kahan fails to explain how, even if this fact were true, a less-qualified female teaching the classes he was scheduled to teach in the 2010-2011 academic year raises an inference of gender discrimination under the facts of this case. Kahan has not established that these unspecified "qualifications" were the only, or even the most important, factor SRU considered when assigning classes. The record includes no evidence about Klenovich's areas of expertise, existing course-load for the 2010-2011 academic year, class schedule, or personal availability, as compared to male faculty members. The record, therefore, contains no evidence from which a reasonable jury could make the logical leap that Kahan was the victim of reverse gender discrimination based solely upon his conclusory allegation that the classes he planned to teach in the 2010-2011 academic year were assigned to a woman. Solomon v. Soc'y of Auto. Engineers, 41 F.App'x 585, 586 (3d Cir. 2002).

Neither comparison asserted by Kahan to this female faculty member would permit a reasonable jury to make an inference of gender discrimination.

### (ii) **Gender Stereotypes**

Kahan's multiple references to supposed gender stereotypes, likewise, do not give rise to an inference of gender discrimination, as Kahan alleges. According to Kahan's opposition brief, he can establish a prima facie case because Mrs. Winslow complained about Kahan's "harassment and targeting of" her son due to his disability, and about Kahan's "good-looking man" comment, and described or portrayed Kahan as "sneaky," a liar, "arrogant," "rude," "demanding," "self-centered," "aggressive," "violent," and "belittling," among other things, all of which "conform to sexist stereotypes about the alpha male." (ECF No. 100 (Kahan brief) at 12-14.) Kahan argues that "Craig piggybacked on and adopted these gender stereotypes," by listing "problematic behavior," "lack of responsibility," "arrogance," and "other personality issues" in his March 18, 2010 draft memorandum to Dean Tsuquiashi-Daddesio explaining why he was rescinding his prior recommendation that Kahan's contract be renewed (Id. at 14.)

None of the comments to which Kahan cites, whether made by Mrs. Winslow or Craig, are inherently gender-specific.[2] In order to rule in Kahan's favor, a jury would be required to conclude that men, but not women, are "rude," "demanding," "aggressive," "irresponsible," or "belittling," and that only male teachers target or harass students about their disabilities or make "odd" remarks to students when they are inattentive during class. There is no basis on this record for a reasonable jury to make that finding. Kahan produced no evidence

---

[2] Kahan's reliance on the remark that "Kahan 'bulls around' the office" to support his prima facie case is without consequence because it was made by a fellow professor, Alan Levy, who Kahan does not even allege had any decisionmaking authority. (ECF No. 100 (Kahan brief) at 13; ECF No. 122, SRU CCSMF ¶ 202.) Professor Levy's comment, as well as Mrs. Winslow's comments accusing Kahan of being violent and calling her a bitch, were made after SRU decided not to renew Kahan's contract and cannot, as a matter of logic and chronology, have caused SRU not to renew Kahan's contract.

that would support such a finding in this case, beyond his own personal belief and attorney argument.

A review of the decisions upon which Kahan relies to support his argument that he was the victim of invidious gender stereotypes at SRU actually demonstrates the deficiencies in Kahan's prima facie case. In Tingley-Kelley, a student who was repeatedly denied admission to an academic program brought forth evidence that admission committee members denied her application because, as the mother of several young children, she would prioritize her at-home commitments above school. Tingley-Kelley, 677 F.Supp.2d at 775. In Sassaman, the plaintiff's supervisor openly commented that the plaintiff likely engaged in the accused conduct because men have a propensity to sexually harass female co-workers. Sassaman v. Gamache, 566 F.3d 307, 312-13 (2d Cir. 2009).[3] Comments about females' failure to prioritize work over family commitments, or about males' propensity to sexually harass female coworkers are substantively and dispositively dissimilar to Kahan's evidence that Mrs. Winslow and Craig described him as "rude" or "arrogant" or "self-centered." The latter terms do not have any inherent gender-specific meaning,[4] and ascribe no pejorative characteristic to Kahan based upon an invidious gender stereotype. No reasonable jury could infer that SRU treated females more favorably than males based upon the evidence of purported gender stereotypes produced by Kahan, making it

---

[3] Wolski, the other case cited by Kahan, need not be discussed because that case was brought pursuant to the ADA, and any discussion therein about fear that the plaintiff would "pose a threat" to other employees is based upon express statutory and regulatory language under the ADA that permits an employer to require that an individual not pose a "direct threat" to the health or safety of other workers. Discussion in that case about the plaintiff being a threat to co-workers was not based upon the court's determination that such terminology was a gender stereotype. Wolski v. City of Erie, 900 F.Supp.2d 553, 559 (W.D. Pa. 2012) (citing 42 U.S.C. § 12113(b) and 29 C.F.R. § 1630.15(b)(2)).

[4] Perhaps the best proof of this fact is that when Kahan complained to Craig about Mrs. Winslow's refusal to order scantron grading sheets, Kahan insisted that Mrs. Winslow was the one being "rude" to him. (ECF No. 117-1 at 68-71, 78-80 (Craig depo. at 161-64, 171-73).)

impossible for Kahan to satisfy his burden to establish a prima facie case of gender discrimination on this basis. Iadimarco, 190 F.3d at 161.

Kahan offers no other evidence in support of his prima facie case. The court concludes, based upon this record, that Kahan did not satisfy his threshold burden of proof on his gender discrimination claims. Judgment could be entered against Kahan on his Title VII and Title IX gender discrimination claims on this basis alone. For the purpose of completeness, however, the court will consider whether Kahan would be able to prove that SRU's proffered legitimate, nondiscriminatory reason for not renewing his contract was a pretext for discrimination. Because Kahan is unable to meet his burden to prove pretext, entry of judgment in favor of SRU on Counts I and III remains proper under that circumstance as well.

### c. **Pretext**

Assuming for the purpose of this opinion only that Kahan could establish a prima facie case of gender discrimination, SRU offered a legitimate, nondiscriminatory reason for not renewing his contract; that Kahan repeatedly missed deadlines and meetings during his first-year, probationary term of employment. (ECF No. 78 (SRU brief) at 11.) Kahan contends that there is ample evidence that SRU's reason for not renewing his contract is entirely false, largely false, pretextual, or reflects "only de minimus infractions that had been previously excused or condoned in the Department." (ECF No. 100 (Kahan brief) at 16.) The court analyzes Kahan's contention under the two-prong Fuentes test.

Prong one of the Fuentes test focuses on whether Kahan submits evidence from which a fact-finder could reasonably disbelieve SRU's articulated legitimate reason for its employment decision. Under this prong, Kahan must point to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' ...and hence infer 'that the employer did not act for [the asserted] nondiscriminatory reasons.'" Fuentes, 32 F.3d at 765 (internal citations omitted). The question at prong one of the Fuentes test "is not whether the employer made the best, or even a sound, business decision;" it is whether the real reason for the employment decision was discrimination. Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997). Kahan can survive summary judgment under prong two of the Fuentes test if he can demonstrate, through evidence of record, that gender discrimination was more likely than not a motivating cause of the adverse employment action. Fuentes, 32 F.3d at 762. The kinds of evidence relied upon by the Court of Appeals for the Third Circuit under this prong of the Fuentes test are: 1) whether the employer previously discriminated against the plaintiff; 2) whether the employer has discriminated against other persons within the plaintiff's protected class or within another protected class; and 3) whether the employer has previously treated more favorably similarly situated persons not within the protected class. Simpson, 142 F.3d at 644-45.

Before proceeding with a detailed analysis of each of these prongs, the court notes that Kahan's evidence of pretext suffers from a fundamental, oft-repeated, and fatal defect. By Kahan's own argument, admission, and evidence, even if SRU was attempting to disguise its purported "real reasons" for deciding not to renew his contract, those "real reasons" were that a) Mrs. Winslow was angry and vengeful about how Tommy Winslow was treated by Kahan when Tommy requested an ADA accommodation in December 2009, and SRU chose to placate Mrs. Winslow by not retaining Kahan, and b) Craig was angry that Kahan missed deadlines because he was teaching classes at a local community college at the same time that he taught classes at SRU. (ECF No. 100 (Kahan brief) at 16-17; ECF No. 122, SRU CCSMF ¶ 27.) These "real

reasons" are not gender-based, and therefore, are immaterial to a pretext analysis, which is always aimed at determining whether the real reason for the employment decision was discrimination.

As discussed in detail above, Kahan's attempt to infect SRU's non-renewal decision with gender discrimination based upon Mrs. Winslow's comments that allegedly characterized Kahan as "the stereotypical alpha-male" fails. Although there is no reasonable dispute on this record that Mrs. Winslow did not care for Kahan, there is a complete lack of evidence that Mrs. Winslow's dislike for Kahan was based upon his gender. Even if Dean Tsuquiashi-Daddesio and Craig changed their renewal recommendation based upon Mrs. Winslow's complaints about Kahan, it does not follow, from a logical or evidentiary standpoint, that Kahan's contract was not renewed because he is a man, which is always the determinative question in a gender discrimination case. No reasonable jury could conclude, based upon this record and Kahan's own arguments, that the real reason Kahan's contract was not renewed was gender discrimination. This fundamental defect makes it impossible for Kahan to satisfy either the first or second prong of the <u>Fuentes</u> test. The court will nonetheless put this deficiency aside and separately examine each <u>Fuentes</u> factor.

### (i) *Fuentes* Test: Prong One

According to Kahan, a reasonable jury could disbelieve SRU's reason for not renewing his contract because it suffers from weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions. (ECF No. 100 (Kahan brief) at 16-18.) The court concludes that there is insufficient evidence to permit a reasonable jury to disbelieve SRU's proffered legitimate, nondiscriminatory reason for not renewing his contract on any of the various grounds Kahan now asserts.

Kahan first contends, with respect to each deadline that Craig and Dean Tsuquiashi-Daddesio accuse him of missing in their March 23, and 25, 2010 memoranda, either that he did not miss the deadline, or that other members of the history department engaged in similar misconduct but suffered no adverse consequences. (Id. at 16-17.)  The undisputed record reflects, however, that Kahan admitted in his March 28, 2010 memorandum to Provost Williams that he submitted his grades and student attendance sheets ("salmon-colored sheets") late, (ECF No. 803 at 39-41 (Kahan memo)), and missed a faculty meeting, (id. at 40).  Even if Craig and Dean Tsuquiashi-Daddesio were mistaken about Kahan missing certain other deadlines or overreacted to his failure to meet these deadlines, this court is not to second-guess SRU's decision, but only to determine whether a reasonable jury could disbelieve SRU's reasons for not renewing his contract. Keller, 130 F.3d at 1109.  Where Kahan admits that he missed at least some of the meetings and deadlines cited by SRU as justifying his non-renewal, no reasonable jury could conclude that SRU's legitimate, nondiscriminatory reason is not to be believed because it suffers from probative weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions because he did not miss each and every deadline he was accused of missing.

Although Kahan argues that SRU's proffered reason for not renewing his contract is not worthy of belief because SRU failed to discipline other employees who missed similar deadlines, Kahan is unable to establish that he was treated less favorably than any other first-year probationary employee who admittedly missed multiple deadlines.  As an initial matter, among the other employees to which Kahan compares himself are both men and women, which itself bars any reasonable finding of gender bias. (ECF No. 122, SRU CCSMF ¶¶ 139, 149.)  Kahan provides no other evidence about the circumstances under which these other employees missed deadlines, and notably does not allege that any other employee was a probationary employee

who missed several deadlines during his or her first year of employment. The undisputed record reflects that both Dean Tsuquiashi-Dadesio and Craig cited Kahan's *pattern* of missing deadlines as the reason for not recommending renewal of his contract. (ECF No. 105-2 at 45 (Craig memo) ("[t]his pattern of lapses and/or mistakes causes me to revise my evaluation of Dr. Kahan"); ECF No. 80-3 at 31 (Dean memo) ("[w]hile any one of these issues in isolation could be considered a regrettable lapse in judgment… their accumulation do [sic] show a pattern of non-compliance").) On this record, no reasonable jury could disbelieve SRU's reason for not renewing Kahan's contract even if it accepted as true Kahan's allegation that other male and female employees missed a deadline, but did not suffer adverse consequences.

Second, Kahan contends that SRU's proffered legitimate, nondiscriminatory reason is unworthy of belief because Craig's subsequent statements to Kahan about the non-renewal of his contract contradict the reasons Craig set forth in his March 23, 2010 memorandum. (ECF No. 100 (Kahan brief) at 17.) The statements to which Kahan refers are that things would have been different if Kahan had been "nicer" or easier to get along with, and that Kahan's contract was not renewed because Kahan's adjunct work at a community college interfered with his SRU responsibilities. (ECF No. 122, SRU CCSMF ¶ 27.) As an initial matter, the second comment does not contradict SRU's proffered legitimate, nondiscriminatory reason for not renewing Kahan's contract, but further explains Craig's personal belief that Kahan missed SRU deadlines because he prioritized his work at the community college. To the extent the first statement contradicts SRU's proffered legitimate, nondiscriminatory reason it again demonstrates that SRU's actual motivation was to placate Mrs. Winslow, who found Kahan difficult to work with and "rude;" it does not provide any basis on which a reasonable jury could conclude that SRU's actual motivation was to discriminate against Kahan on the basis of his

gender. On this record, no reasonable jury could disbelieve SRU's reason for not renewing Kahan's contract based upon Kahan's allegation that Craig made statements that contradicted SRU's proffered legitimate, nondiscriminatory reason for not renewing his contract.

Third, Kahan contends that SRU's proffered legitimate, nondiscriminatory reason is unworthy of belief because Dean Tsuquiashi-Daddesio's March 25, 2010 memorandum to Provost Williams removes the reference to Mrs. Winslow's March 21, 2010 complaint letter, which reference was included in the Dean's March 23, 2010 draft memorandum. (ECF No. 100 (Kahan brief) at 17-18.) Kahan is correct that Dean Tsuquiashi-Daddesio's final memorandum removes any reference to the letter Craig received from Mrs. Winslow about her son's difficulty in securing an ADA accommodation in Kahan's class. (ECF No. 101-5 at 4 (Dean draft memo); ECF No.80-3 at 31 (Dean final memo)). That deletion, however, reflects no intent on the part of Dean Tsuquiashi-Daddesio to hide a gender-based motivation for her recommendation that Kahan's contract not be renewed. It instead, at most, and in keeping with the entirety of the record, reflects the Dean's effort to distance her decision from the complaints Mrs. Winslow made about Kahan. As previously discussed, however, there is no evidence in the record that Mrs. Winslow's complaints and comments were grounded in gender bias or discrimination. See supra Sec. III.A.1(b)(ii). On this record, no reasonable jury could disbelieve SRU's reason for not renewing Kahan's contract based upon Dean Tsuquiashi-Daddesio's deletion of her prior reference to Mrs. Winslow's complaint letter from her March 25, 2010 memorandum to Provost Williams.

Fourth, Kahan contends that SRU's proffered legitimate, nondiscriminatory reason is unworthy of belief because SRU "complete[ly] abandon[ed]…any adherence to the standard evaluation procedures" applicable to probationary faculty in deciding not to renew his

contract. (ECF No. 100 (Kahan brief) at 18.) Although Kahan does not fully articulate his argument on this point, the court gleans from his briefing as a whole that Kahan's argument is that SRU's reasons for non-renewal are not be believed because SRU had no procedure by which its officials could change an initially favorable renewal recommendation to an unfavorable renewal recommendation.

Kahan's argument is without factual support in the record. The CBA sets forth deadlines by which the department evaluation committee, department chairperson, and dean must meet with the faculty member and then submit written evaluations of that faculty member to the appropriate higher-ranking SRU officials. (ECF No. 80-1 at 51 (CBA, Art. 12 § C(1)(c)) and 53 (CBA, Art. 12, § F(3)).) All evaluations are due under the CBA by February 28 and the faculty member is entitled to notice of SRU's final decision with respect to contract renewal no later than April 1. Although Kahan's evaluations were submitted by that date, Dean Tsuquiashi-Daddesio and Craig both submitted memoranda at the end of March 2010 changing their initially favorable recommendations to unfavorable recommendations. (ECF No. 80-3 at 22 & 23 (Dean initial recommendations); ECF No. 80-3 at 18-20 (Craig initial recommendation); ECF No. 80-3 at 31 (Dean revised recommendation); ECF No. 105-2 at 45 (Craig revised recommendation).) According to Kahan, because the CBA does not provide a deadline or procedural mechanism by which to change a favorable recommendation to an unfavorable recommendation, and because the Dean's and Craig's revised recommendations were made after February 28, 2010, a reasonable jury could disbelieve SRU's proffered reasons for not renewing his contract, and conclude, instead, that the real reason for SRU's decision was gender discrimination.

Kahan's argument misses the mark. The CBA is silent with respect to SRU's need to revise a previously-issued recommendation concerning renewal of a probationary employee's contract. Dean Tsuquiashi-Daddesio and Craig did not "abandon" the evaluation process in March 2010 by changing their recommendations, as Kahan contends; they had no procedural guidelines to follow.

To the extent Kahan suggests that SRU officials can never revise a recommendation once it is submitted, his argument is unfounded. A myriad of circumstances, both positive and negative, could occur that would require SRU to revise a previously-made evaluation. Any suggestion that SRU would be prohibited from making any revisions is illogical. With that said, the record reflects that both Dean Tsuquiashi-Daddesio and Craig attempted to follow the spirit and intent of the CBA by notifying Kahan, in person, that their recommendation would be changed, explaining the reasons for the change, and providing him with copies of their March 23 and 25, 2010 memoranda reflecting the change. See supra p. 8. Kahan was given numerous opportunities to discuss these reasons with Dean Tsuquiashi-Daddesio, Craig, the history department evaluation committee, and Provost Williams before President Smith issued the final determination not to renew Kahan's contract. See supra pp. 8-9. This record does not support a reasonable jury inference that the procedures by which SRU decided not to renew Kahan's contract were so unusual, unfair, or lacking that they must have been a subterfuge for gender discrimination.

Kahan failed to produce any evidence to support a reasonable jury finding that SRU's proffered legitimate, nondiscriminatory reason cannot be believed because it suffers from weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions. Kahan, therefore,

cannot avoid entry of summary judgment on his gender discrimination claims pursuant to prong one of the <u>Fuentes</u> test.

### (ii) *Fuentes* **Test: Prong Two**

Even though Kahan failed to produce evidence that could support a reasonable jury finding under the first prong of the <u>Fuentes</u> test, he can survive summary judgment if, under the second prong of the <u>Fuentes</u> test, he can demonstrate that "discrimination was more likely than not a motivating cause of the adverse employment action." <u>Fuentes</u>, 32 F.3d at 762. Kahan can do so by showing that: 1) SRU previously discriminated against him; 2) SRU discriminated against other persons within any protected class; or 3) SRU previously treated more favorably similarly situated persons not within Kahan's protected class. <u>Simpson</u>, 142 F.3d at 644–45. Kahan does not specifically address this second prong of the <u>Fuentes</u> test, and accordingly, fails to identify any evidence pertinent to these three considerations. The court nevertheless considered the entirety of the record in light of each consideration to determine whether Kahan's claim could possibly survive summary judgment under prong two of the <u>Fuentes</u> test. In doing so, the court reiterates that because Kahan failed to prove his <u>prima facie</u> case, the court does so only for the purpose of completeness in disposing of the instant motion.

No reasonable jury could conclude that SRU previously discriminated against Kahan. The only evidence possibly relevant to this factor is Kahan's contention that he was required to share an office, but Klenovich, an allegedly lower-ranked female faculty member, was not, and Klenovich taught the classes he planned to teach during the 2010-2011 academic year. (ECF No. 100 (Kahan brief) at 15; ECF No. 122, SRU CCSMF ¶ 212.) As addressed above in section III.A.1(b)(i), Kahan failed to submit sufficient evidence to permit the court to fully evaluate the factual assertions about Klenovich and to determine whether Klenovich was

similarly situated to Kahan. The court is unable to determine whether SRU's assignment of offices is indicative of prior reverse gender discrimination against Kahan. The assignment of classes to Klenovich is likewise not indicative of SRU's previous reverse discrimination against Kahan, for the reasons set forth above.

The record is devoid of any evidence that SRU previously discriminated against other persons within any protected class, or engaged in reverse discrimination against those, like Kahan, that fall outside a protected class. The record is likewise devoid of any evidence that SRU previously treated similarly situated persons not within Kahan's protected class, i.e., women, more favorably than men. Again, the only evidence possibly relevant to this factor is the assignment of classes and an office to Klenovich, which this court has found to be unsupported and insufficient to establish gender discrimination.

Kahan failed to produce any evidence to support a reasonable jury finding that gender discrimination was more likely than not a motivating cause of SRU's failure to renew his contract. Kahan, therefore, cannot avoid entry of summary judgment on his gender discrimination claims pursuant to prong two of the Fuentes test.

Because Kahan failed to present evidence sufficient to establish a prima facie reverse discrimination case, or to support a reasonable jury finding that SRU's proffered reason for not renewing his contract was a pretext for gender discrimination, judgment must be entered in favor of SRU on the gender discrimination claims asserted in Counts I and III of Kahan's second amended complaint.

## 2. **Hostile Work Environment Claims (Counts II and IV)**

SRU moves for summary judgment on Kahan's hostile work environment claims on the ground that Kahan cannot establish that the non-renewal of his contract was motivated by his gender. (ECF No. 78 (SRU brief) at 12-13.)  According to SRU, the undisputed record establishes that Kahan's contract was not renewed because Mrs. Winslow harbored hostility toward him based upon how Kahan treated Tommy Winslow when he requested an accommodation based upon his disability, and Craig and Dean Tsuquiashi-Daddesio preferred to placate and retain Mrs. Winslow, instead of Kahan. (Id.)  In response, Kahan argues that "false accusations of sexual harassment adequately support [his] claim for a sexually hostile work environment." (ECF No. 100 (Kahan brief) at 18-21.)  For the reasons set forth below, neither Kahan's Title VII nor Title IX hostile work environment claim survives summary judgment.

### a. **Legal Standards**

Title VII prohibits sexual harassment that is "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986).  To succeed on a hostile work environment claim, the plaintiff must establish that: 1) the employee suffered intentional discrimination because of his sex; 2) the discrimination was severe or pervasive; 3) the discrimination detrimentally affected the plaintiff; 4) the discrimination would detrimentally affect a reasonable person in like circumstances; and 5) the existence of respondeat superior liability. Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006), overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).  The first four elements establish a prima facie hostile work environment case, and the fifth element establishes employer liability. Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 104 (3d Cir. 2009).

To determine whether an environment is hostile, a court must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Mandel v. M & Q Packaging Corp., 706 F.3d 157, 168 (3d Cir. 2013) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993) and Caver v. City of Trenton, 420 F.3d 243, 262–63 (3d Cir. 2005)).  To survive summary judgment, a plaintiff must present some evidence that the workplace was permeated with discriminatory intimidation, ridicule, or insult that was so severe or pervasive that it altered the conditions of employment and created an abusive working environment. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002); Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 278–79 (3d Cir. 2001) (citing Harris, 510 U.S. at 21)).

If a supervisor creates the hostile environment, the employer is strictly liable, though an affirmative defense may be available where there is no tangible employment action. Jensen v. Potter, 435 F.3d 444, 448 (3d Cir. 2006). When the hostile work environment is created by a plaintiff's non-supervisory co-workers, the employer is not automatically liable. Huston, 568 F.3d at 104-05.  Employer liability for co-worker harassment exists only if the employer was negligent in failing to train, discipline, fire, or take remedial action upon notice of the harassment. Bonenberger v. Plymouth Twp., 132 F.3d 20, 26 (3d Cir. 1997).

Both Kahan and SRU presuppose that the hostile work environment claims brought pursuant to Title VII and Title IX are legally indistinguishable.  They are not.  As a threshold matter, Title IX only applies to those employers that are recipients of federal funds. Haffer v. Temple Univ. of Com. System of Higher Ed., 524 F.Supp. 531, 534 (E.D. Pa. 1981). There is no dispute in this case that SRU qualifies as a recipient of federal funds, making this

distinction inconsequential.  The operative elements of a <u>prima</u> <u>facie</u> hostile work environment claim are otherwise essentially the same.  <u>Stanley v. Trustees of Cal. State Univ.</u>, 433 F.3d 1129, 1134 (9th Cir. 2006); <u>Hoffman v. Saginaw Pub. Schools</u>, No. 12-10354, 2012 WL 2450805, at * 6 (E.D. Mich. Jun. 27, 2012) (citing <u>Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.</u>, 526 U.S. 629, 650-51 (1999)); <u>Young v. Pleasant Valley Sch. Dist.</u>, No. 07-854, 2012 WL 1827194, at * 10 n.11 (M.D. Pa. May 18, 2012).

In order to impose liability on an employer under Title IX, however, a plaintiff must prove that the employer was deliberately indifferent to a report of discrimination. <u>See Milligan v. Bd. of Trustees of S. Ill. Univ.</u>, 686 F.3d 378, 387-88 (7th Cir. 2012) (citing <u>Gebser v. Lago Vista Indep. Sch. Dist.</u>, 524 U.S. 274, 290-91 (1998)).  This standard is more stringent than the negligence standard that applies under Title VII. However, given that, as explained in detail below, Kahan cannot survive summary judgment on his Title VII hostile work environment claim because, among other things, he cannot establish that SRU was negligent in responding to a complaint of sexual harassment, Kahan would be unable to meet Title IX's higher deliberately indifferent standard.  In this case, therefore, there is no relevant distinction between Kahan's Title VII and Title IX hostile work environment claims, and they will be considered together, with no further distinction made in this opinion.

### b.  **The *Prima Facie* Case**

Kahan contends that he was subjected to severe and pervasive intentional gender discrimination because Mrs. Winslow repeatedly falsely accused him of sexually harassing Tommy Winslow, going so far as to threaten to sue SRU and Kahan for sexual harassment. (ECF No. 100 (Kahan brief) at 19-20.)  In support of this critical contention, Kahan's brief relies on the factual averments and supporting evidence found in paragraphs 86, 89, 92-95, 99-100, 123, and

157 of SRU's Combined Concise Statement of Material Facts. (Id. at 18.) There is no evidence in the cited averments, or elsewhere in the record, however, that Mrs. Winslow repeatedly accused Kahan of sexually harassing her son.

The record reflects, instead, that Mrs. Winslow related the "good-looking man" comment to McCoy and Quidone in December 2009 in the course of complaining about Kahan's refusal to grant Tommy an extension of time for his final report. (ECF No. 122, SRU CCSMF ¶ 89.) When Dean Tsuquiashi-Daddesio asked Mrs. Winslow in March 2010 about her son's "problems" with Kahan in class, Mrs. Winslow again complained about Kahan's refusal to accommodate Tommy's disability, and recounted the "good-looking man" comment, characterizing it as "a very odd comment." (Id. ¶ 157 (Mrs. Winslow depo. at 62, 66-67).) Following that meeting with Dean Tsuquiashi-Daddesio, Mrs. Winslow drafted a letter to Craig that memorialized her complaints about Kahan. That letter notably includes no reference to the "good-looking man" comment and makes no allegations of sexual harassment, and instead accuses Kahan of harassing Tommy Winslow based upon his disability. (Id. ¶ 123; ECF No. 80-3 at 47-48 (Mrs. Winslow complaint letter).)

There is no evidence that Mrs. Winslow accused Kahan of sexually harassing her son, whether based upon the "good-looking man" comment or otherwise, in her interactions with McCoy, Quidone, the Dean, or Craig. There is likewise no evidence that Mrs. Winslow threatened to sue SRU or Kahan for sexual harassment. No reasonable jury could conclude based upon this record that Mrs. Winslow repeatedly accused Kahan of sexually harassing her son, or threatened to file a sexual harassment lawsuit against him, and SRU. Because Kahan's hostile work environment claims are based solely upon the contention that Mrs. Winslow

44

repeatedly falsely accused him of sexually harassing Tommy Winslow, they must fail on this basis alone.[5]

The record, including Kahan's own deposition testimony, reflects that Mr. Winslow is the person who accused Kahan of sexually harassing Tommy Winslow. This accusation occurred during a single phone conversation between Mr. Winslow and Quidone in December 2009 concerning Tommy's request for an extension of time on his final report. (ECF No. 84-3 at 7, 12, and 16; ECF No. 101-2 at 5, 26-27, and 52 (Kahan depo. at 143, 144, 152, 175-76, 268, and 312).) Although both Mr. Winslow and Quidone agree that Mr. Winslow only mentioned filing an ADA complaint, not a sexual harassment lawsuit, during that phone call, the court will resolve this factual dispute in Kahan's favor, and find that Mr. Winslow told Quidone that he would sue SRU and Kahan for sexual harassment if Tommy was not granted an extension of time on his final report, and that Quidone conveyed that threat to McCoy, Craig, and Kahan. (ECF No. 84-1 at 6-7 (Mr. Winslow depo. at 46-47); ECF No. 84-2 at 9-12 (Quidone depo. at 103-06).)

The evidence, even viewed in the light most favorable to Kahan, is that Quidone informed McCoy, Craig, and Kahan about the comment only during the course of securing an extension of time for Tommy Winslow's final project in December 2009. It follows that Quidone infrequently made the statement. The statement was not severe or physically threatening or humiliating to Kahan. Although Kahan contends that the threat of being sued caused him concern, and made him hesitant to give Tommy Winslow a failing grade in his class, Kahan does not contend, and provides no evidence to prove, that his daily work duties or

---

[5] Kahan does not even allege that Mrs. Winslow's recounting of the "good-looking man" comment to McCoy, Quidone, and Dean Tsuquiashi-Daddesio constituted severe or pervasive gender discrimination itself.

performance were unreasonably interfered with because of Mr. Winslow's threat. (ECF No. 100 (Kahan brief) at 20; ECF No. 122, SRU CCSMF ¶¶ 99-100); <u>Mandel</u>, 706 F.3d at 168. No reasonable jury could conclude that Quidone's reiteration of Mr. Winslow's threat created a workplace permeated with discriminatory intimidation, ridicule, or insult that was so severe or pervasive that it altered the conditions of Kahan's employment and created an abusive working environment.

Kahan relies on no other evidence to support his contention that he suffered severe or pervasive intentional gender discrimination, and was the victim of a hostile work environment. Based upon the totality of the circumstances, a reasonable jury would have no basis on which to find that Kahan satisfied the first two elements of his <u>prima facie</u> case. Under the circumstances, the court need not address Kahan's argument that the "false charges of sexual harassment" detrimentally affected him (element three), and would detrimentally affect a reasonable person in like circumstances (element four). (ECF No. 100 (Kahan brief) at 20-21.) The court, likewise, need not address Kahan's singular allegation, made in the closing sentences of his briefing on his hostile work environment claims, that "being falsely accused of calling a co-worker a 'bitch'" would "detrimentally affect a reasonable person in like circumstances." (<u>Id.</u> at 20-21.) Kahan does not otherwise rely on this isolated statement, which was made in May 2010, to establish his <u>prima facie</u> case, and it, standing alone against the totality of the circumstances, is insufficient to overcome SRU's motion for summary judgment.

## c. *Respondeat Superior* Liability

Even assuming for the sake of argument that Kahan could make out a prima facie hostile work environment claim, the record is devoid of any evidence that would permit a reasonable jury to assign liability to SRU based upon the fact that Mrs. Winslow related Kahan's "good-looking man" comment to McCoy, Quidone, and Dean Tsuquiashi-Daddesio, or that Quidone related Mr. Winslow's threat to sue for sexual harassment to McCoy, Craig, and Kahan.[6]  Because Mrs. Winslow and Quidone were Kahan's co-workers, in order to impose liability upon SRU under Title VII, Kahan must come forth with evidence that SRU was negligent in failing to train, discipline, fire, or take remedial action upon being notified of the harassment. Huston, 568 F.3d at 104-05, Bonenberge, 132 F.3d at 26.  Kahan would have to meet the higher, deliberate indifference standard in order to impose liability on SRU under Title IX.  Milligan, 686 F.3d at 387-88.  Although Kahan neither acknowledges, nor addresses, this legal standard, Kahan argues elsewhere in his briefing on the hostile work environment claim that he "spoke to Craig about his concerns regarding the Winslows' bogus sexual harassment charge," but that Craig took no action. (ECF No. 100 (Kahan brief) at 20; ECF No. 122, SRU CCSMF ¶¶ 99-100.)  Kahan's reference is to a meeting that Kahan and Craig had in January 2010 to discuss the final grade that should be assigned to Tommy Winslow for Kahan's fall 2009 semester Pennsylvania history class.

Contrary to Kahan's current characterization of that meeting, by Kahan's own account, his purpose in talking with Craig at that time was not to complain that Mrs. Winslow or Quidone was sexually harassing him, but to seek advice, guidance, and support from Craig with respect to assigning Tommy a final grade in his class in order to avoid further conflict about the

---

[6] Mr. Winslow is not an employee or agent of SRU, and his threat to sue, itself, could provide no basis for respondeat superior liability.

matter with Tommy Winslow, and his parents. (ECF No. 84-3 at 15; ECF No. 101-2 at 2, 18 (Kahan depo. at 141, 164, and 267).) There is no dispute that Kahan expressed concern to Craig at that meeting about failing Tommy based upon the "crazy ideas" and "lies" that "the Winslows'" concocted in December 2009 in order to "pressure the university" into giving Tommy Winslow an extension of time. (Id.) Such statements, however, would not put a reasonable supervisor on notice that the Kahan believed himself to be the victim of sexual harassment at the hands of his co-workers. No reasonable jury could find, based upon that meeting, that Craig knew or should have known that Kahan was being sexually harassed by Mrs. Winslow or Quidone but failed to take appropriate remedial action.

The court independently examined the record, and can identify only one other conversation that Kahan had with a supervisor that concerned Mrs. Winslow or Quidone. Following spring break, Kahan met with Craig on March 15, 2010, about a "heated exchange" that Kahan had with Mrs. Winslow prior to spring break about her refusal to order testing supplies (the scantron sheets) for him. (ECF No. 80-3 at 43 (Kahan email).) During this meeting with Craig, by Kahan's own account, Kahan told Craig that Mrs. Winslow was rude to him, and that it was inappropriate for Mrs. Winslow, as a secretary, to tell a professor "why don't you learn how to teach," and that her behavior "crossed the line into harassment." (ECF No. 101-2 at 29-32 (Kahan depo. at 179-82).) Kahan's complaints to Craig about his "heated exchange" with Mrs. Winslow were unrelated to his gender, but were instead directed toward matters of administrative hierarchy and professionalism in the office. They provide no basis for a reasonable jury to conclude that Kahan notified Craig that he was being sexually harassed by Mrs. Winslow in March 2010, but Craig acted negligently in responding to the complaint.

The record is devoid of any evidence that Kahan spoke with any SRU official about Quidone repeating Mr. Winslow's threat to sue him for sexual harassment to McCoy, Craig, and himself.  There would be no basis for a reasonable jury to conclude that SRU acted negligently in responding to a complaint that Quidone was harassing Kahan.

After careful consideration of SRU's motion for summary judgment, the filings in support and opposition thereto, the memoranda of the parties, the relevant case law, and the record as a whole, this court finds that there is not sufficient record evidence upon which a reasonable jury could return a verdict for Kahan on his hostile work environment claims. Judgment will therefore be entered in favor of SRU on Counts II and IV.

### 3. Retaliation Claims (Counts XVI and XVII)

SRU moves for summary judgment on Kahan's Title VII retaliation claims on the ground that Kahan cannot establish that his filing of charge of discrimination with the EEOC was the but-for cause of either SRU's decision to refile criminal charges against him in 2010, or SRU's decision not to hire him in 2011 to fill the position created when his own contract was not renewed. (ECF No. 78 (SRU brief) at 19-21.)  In response, Kahan alleges that there is ample evidence of a causal link between his filing of an EEOC charge and SRU's adverse decisions based upon a) close temporal proximity between the EEOC charge and the refiling of the criminal charges, and b) a pattern of antagonism between the EEOC charge and the failure to hire. (ECF No. 100 (Kahan brief) at 30-31.)   For the reasons set forth below, Kahan's Title VII retaliation claims cannot survive summary judgment.

To establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate that: (1) he engaged in activity protected by Title VII; (2) the employer took an adverse action against him; and (3) there was a causal connection between his participation in the

protected activity, and the adverse action. <u>Blakney v. City of Phila.</u>, 559 F.App'x 183, 185 (3d Cir. 2014) (citing <u>Moore v. City of Phila.</u>, 461 F.3d 331, 340–41 (3d Cir. 2006)); <u>Nelson v. Upsala Coll.</u>, 51 F.3d 383, 386 (3d Cir. 1995). An adverse employment action means that "a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" <u>Moore</u>, 461 F.3d at 341 (quoting <u>Burlington</u>, 548 U.S. at 68). Title VII's retaliation provision is broader than its discrimination provision, and is not limited to employment-related or workplace actions. <u>Burlington</u>, 548 U.S. at 61.

With respect to the causal connection element, the court may consider "a broad array of evidence." <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 284 (3d Cir. 2000). Unusually suggestive temporal proximity between protected activity and adverse action may be sufficient on its own to create an inference of causality. <u>Id.</u> at 280; <u>see</u> <u>Clark Cnty. Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273–74 (2001). However, "the mere fact that adverse employer action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." <u>Robinson v. City of Pittsburgh</u>, 120 F.3d 1286, 1302 (3d Cir. 1997), abrogated on other grounds, <u>Burlington</u>, 548 U.S. at 61. If the temporal proximity is not unusually suggestive, a court may consider whether the record evidence, as a whole, is sufficient to raise an inference of causation, and in doing so may consider evidence of ongoing antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus. <u>Farrell</u>, 206 F.3d at 280.

If the plaintiff sets forth such a <u>prima</u> <u>facie</u> case of retaliation, then the employer must articulate some legitimate, nondiscriminatory reason for its conduct. <u>Moore</u>, 461 F.3d at

342. Once the employer proffers such a reason, the plaintiff must produce evidence sufficient to permit a reasonable jury to conclude that the employer's reason was merely a pretext for retaliation. Id.

In this case, there is no dispute that Kahan's filing of a charge of discrimination with the EEOC satisfies the first element of his prima facie retaliation case. Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 188 (3d Cir. 2003). That charge was filed on September 23, 2010, which is more than four months after Kahan left the employ of SRU. (ECF No. 122, SRU CCSMF ¶ 204; ECF No. 101-8 at 1.)

According to Kahan, he suffered two adverse consequences as a result of filing that EEOC charge: first, on October 13, 2010, SRU's police department refiled criminal assault charges against him stemming from the May 18, 2010 incident with Mrs. Winslow, (ECF No. 122, SRU CCSMF ¶ 206; ECF No. 101-5 at 39 (SRU police incident report); ECF No. 101-5 at 49-51 (criminal docket)); and second, in October 2011, he applied for a position in SRU's history department, but was not hired, (ECF No. 122, SRU CCSMF ¶ 214.) There can be no reasonable dispute that a failure to hire qualifies as an adverse action that satisfies the second element of Kahan's prima facie case. See e.g. Selvanathan v. Opportunities Industrialization Centers Int'l, 871 F.Supp.2d 349, 362 (E.D. Pa. 2012). Although the court discussed above, in section III.A.1(a), that the SRU campus police's filing of criminal charges based upon Mrs. Winslow's incident report may not qualify as an adverse employment action under Title VII's discrimination provision, Title VII's retaliation provision is broader. Burlington, 548 U.S. at 61. The court will presume, therefore, that both SRU's failure to hire Kahan in October 2011 and its refiling of criminal charges against him in October 2010 satisfy the second element of his prima facie retaliation case. This presumption is inconsequential, however, because the court

concludes that Kahan cannot establish the requisite causal link with respect to either adverse action, causing his prima facie case to fail on that basis.

According to Kahan, he can prove a causal connection between his filing of the EEOC charge and SRU's refiling of criminal charges against him based upon "close temporal proximity." (ECF No. 100 (Kahan brief) at 30.) Approximately three weeks passed between these two events. (ECF No. 122, SRU CCSMF ¶¶ 204, 206.) This is an undeniably a short period of time. In this case, however, that short period of time, standing alone, is not probative of retaliatory animus.

The SRU campus police originally filed criminal charges against Kahan, stemming from the purported May 18, 2010 incident on May 20, 2010. (ECF No. 80-5 at 36 (SRU police incident report).) A preliminary hearing on those charges was held on September 14, 2010, at which time the magisterial district judge heard testimony, but took the matter under advisement because a clerical or administrative error had occurred, causing Kahan to be charged under the wrong subsection of the applicable harassment statute. (Id. at 36; ECF Nos. 109-4 at 47-50 and 109-5 at 1-7, 29-34 (preliminary hearing transcript).) At that hearing, the judge indicated that he would speak with various court officials to determine the appropriate course of action, and stated "[w]hat I suspect is going to happen is that I am going to request that this document be refiled" to assert a violation of the correct statutory subsection. (ECF No. 109-5 at 30, 32 (preliminary hearing transcript).) The judge indicated that his goal was to notify counsel around the end of September whether the criminal charges would need to be refiled under the correct subsection. (Id. at 31-32.)

Although the record does not indicate what instructions, if any, the judge eventually gave the litigants, it does reflect that, after seeking advice from an assistant district

attorney on October 8, 2010, the SRU campus police refiled the charges against Kahan on October 13, 2010, asserting a violation of the correct statutory subsection based upon the same operative facts. (ECF No. 80-5 at 36 (SRU police incident report).) The record indicates that SRU campus police officers made the decision to refile the charges against Kahan. There is no evidence that any charging officer knew, or even communicated with any SRU official who knew, that Kahan filed an EEOC charge against SRU on September 23, 2010. Under this sequence of events, the fact that the corrected criminal charges were refiled less than a month after Kahan filed his EEOC charge does not establish the requisite causal connection. Kahan's retaliation claim, therefore, cannot be based upon the October 13, 2010 refiled criminal charges, assuming for the purpose of this opinion only that such conduct could possibly qualify as adverse action.

According to Kahan, he can prove a causal connection between his filing of the EEOC charge and SRU's failure to hire him in October 2011 based upon "evidence of antagonism" between SRU and Kahan. (ECF No. 100 (Kahan brief) at 31.) Kahan is correct that if the temporal proximity is not unusually suggestive, a court may consider evidence of "ongoing antagonism" in evaluating whether the record evidence, as a whole, is sufficient to raise an inference that the failure to hire was caused by retaliatory animus. Farrell, 206 F.3d at 280. Kahan submits two things as proof of "antagonism" with respect to his 2011 employment application: (1) that a former colleague, professor Aaron Cowan, would not recommend him for the teaching job at SRU because of Kahan's "history" and "baggage" with SRU; and (2) that the chair of the search committee, professor Peggy Denning, notified Craig that Kahan applied for the job. (ECF No. 100 (Kahan brief) at 31.) Notably, at the time Kahan filed his EEOC charge,

he had not been employed by SRU for four months, and at the time Kahan applied for a teaching position with SRU in 2011, he had not been employed by SRU for more than a year and a half.

Both of Kahan's proffers fail because although a reasonable jury could infer that these two professors were aware that SRU did not renew Kahan's contract under negative circumstances in 2010, there is no evidence that would permit a reasonable jury to find that either professor Cowan or professor Denning specifically knew that Kahan filed an EEOC charge against SRU more than a year before Kahan reapplied for a teaching job at SRU in October 2011. Knowledge of the EEOC charge cannot be reasonably inferred from professor Cowan's reference to "history" and "baggage" in his October 11, 2010 email to Kahan. (ECF No. 101-8 at 3 (Cowan-Kahan email).) Such generalized references indicate knowledge that Kahan and SRU parted on unfavorable terms, but do not indicate specific knowledge of an EEOC charge. Nor can such knowledge be reasonably inferred from the fact that professor Denning told Craig that Kahan applied for the job. (ECF No. 101-10 at 35 (Craig depo. at 308).) The record is devoid of any evidence that professor Denning told Craig about Kahan's application because an EEOC charge had been filed. Because there is no evidence that either professor knew that Kahan filed an EEOC charge, their comments and conduct cannot be indicative of "ongoing antagonism" between SRU and Kahan based upon his filing of that charge. Kahan cannot establish the requisite causal connection between SRU's failure to hire him when he applied for a teaching position in 2011 and his filing of a charge of discrimination with the EEOC in 2010.

Kahan, therefore, cannot establish a causal connection between any adverse action and his filing of an EEOC charge of discrimination. For this reason, Kahan is unable to prove a prima facie case of retaliation under Title VII, and judgment is appropriately entered in favor of SRU on Counts XVI and XVII.[7]

## B. **The Civil Rights Claims**

In his second amended complaint, Kahan contends that the Individual SRU Defendants, i.e., Dean Tsuquiashi-Daddesio, Craig, and Mrs. Winslow, deprived him of his constitutional rights to equal protection, free speech, and due process. (ECF No. 53 at Counts V – VIII.) 42 U.S.C. § 1983 does not create substantive rights, but instead provides remedies for deprivations of rights established elsewhere in the Constitution or federal laws. Kopec v. Tate, 361 F.3d 772, 775–76 (3d Cir. 2004); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). To prevail under § 1983, a plaintiff must prove that he (a) suffered the deprivation of a right secured by the United States Constitution or federal law, (b) by a person acting under color of state law. Morrow v. Balaski, 719 F.3d 160, 165-66 (3d Cir. 2013) (citing Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000) (en banc)); Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995) Collins v. City of Harker Heights, Tex., 503 U.S. 115, 119–20 (1992).

For the purpose of this opinion, the court will presume that the second element is undisputed.

---

[7] Even if, however, Kahan could meet his burden to prove a prima facie case of retaliation, for at least the same reasons set forth above in section III.A.1(c), Kahan cannot establish that SRU's proffered legitimate, nondiscriminatory reason for not renewing his contract was pretextual. Entry of judgment in SRU's favor on Kahan's Title VII retaliation claims would be proper on this alternative basis.

1. **Equal Protection Claim (Count V)**

The Individual SRU Defendants move for summary judgment on Kahan's § 1983 equal protection claim on the ground that a) Kahan "has adduced no evidence of record that he was discriminated against because of his gender," and b) a "class of one theory…is not available in an action against a state employer." (ECF No. 78 (SRU brief) at 14.) Kahan did not respond to this portion of the Individual SRU Defendants' motion in his opposition brief. (ECF No. 100 (Kahan brief).) Although failure to respond "is not alone a sufficient basis for the entry of summary judgment," the court finds that judgment as a matter of law is appropriately entered in favor of the Individual SRU Defendants on Kahan's equal protection claim under the circumstances of this case. Franklin v. Mingin, No. 11-7229, 2014 WL 2762109, at * 3 (D.N.J. Jun. 18, 2014) (citing Anchorage Assoc. v. Virgin Islands Bd. of Tax Review, 922 F.2d 168, 175 (3d Cir. 1990)); see LCvR 56C(2) (stating requirement that memorandum in opposition to a motion for summary judgment address applicable law and explain why there are genuine issues of material fact to be tried or why the moving party is not entitled to judgment as a matter of law).

Under the Fourteenth Amendment, no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. In other words, all persons similarly situated should be treated alike. City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). In order to bring a successful § 1983 claim for the denial of equal protection, a plaintiff must prove the existence of purposeful gender-based discrimination. Andrews v. City of Phila., 895 F.2d 1469, 1478 (3d Cir. 1990) (citing Batson v. Kentucky, 476 U.S. 79, 93 (1986)). A plaintiff must demonstrate that he received different treatment from that received by other individuals similarly situated, and prove that the disparate treatment was based

upon gender. Id. (citing Kuhar v. Greensburg–Salem Sch. Dist., 616 F.2d 676, 677 n.1 (3d Cir. 1980), and Bohen v. City of East Chicago, 799 F.2d 1180, 1186–87 (7th Cir. 1986)); Keenan v. City of Phila., 983 F.2d 459, 465 (3d Cir. 1992) (citing Andrews, 895 F.2d at 1478). The standard for proving discrimination because of a plaintiff's gender is identical under the Equal Protection Clause and Title VII. Stewart v. Rutgers, The State Univ., 120 F.3d 426, 432 (3d Cir. 1997); Hiester v. Fischer, 113 F.Supp.2d 742, 746-47 (E.D. Pa. 2000) (citing Andrews, 895 F.2d at 1483, n.4).

The above-explained insufficiencies in Kahan's gender discrimination claim under Title VII, are fatal to his § 1983 equal protection claim. Shaw v. Pittsburgh Bd. of Pub. Educ., No. 07-1183, 2009 WL 86709, at * 4 n.1 (collecting decisions) (W.D. Pa. Jan. 12, 2009); see supra Sec. III.A.1. The Individual SRU Defendants' motion for summary judgment must be granted with respect to Kahan's gender-based discrimination claim under § 1983 for the same reasons that the SRU Defendants' motion for summary judgment was granted with respect to Kahan's Title VII gender-based discrimination claim.

Kahan's § 1983 equal protection claim fails for the additional reason that "the Supreme Court has held that 'a class-of-one' theory of equal protection has no place in the public employment context," which claim the court will assume, for the purpose of this opinion only, that Kahan adequately pled and pursued in this litigation. Machon v. Pa. Dep't of Pub. Welfare, 847 F.Supp.2d 734, 748-49 (E.D. Pa. 2012) (quoting Engquist v. Or. Dep't of Agric., 553 U.S. 591, 594 (2008)). "For the state '[t]o treat employees differently is not to classify them in a way that raises equal protection concerns. Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship.'" Id. (quoting Engquist, 553 U.S. at

605).  The Individual SRU Defendants' motion for summary judgment with respect to Kahan's §

1983 equal protection claim must be granted for this additional reason.

Judgment is appropriately entered in favor of the Individual SRU Defendants and

against Kahan on Count V.

### 2. **Free Speech Claim (Count VI)**

The Individual SRU Defendants move for summary judgment on Kahan's § 1983

free speech claim on the ground that Kahan enjoys no First Amendment right of "freedom to

grade." (ECF No. 78 (SRU brief) at 14-15.)  In support of their argument, the Individual SRU

Defendants rely on Brown v. Armenti, 247 F.3d 69 (3d Cir. 2001), and Bradley v. Pittsburgh Bd.

of Educ., 910 F.2d 1172 (3d Cir. 1990).  Kahan opposes the Individual SRU Defendants' motion

on the ground that his First Amendment claim is based upon conduct "significantly broader" than

"forcing Kahan to raise [Tommy Winslow's] grade." (ECF No. 100 (Kahan brief) at 21.)

In his opposition brief, Kahan includes a myriad of purported First Amendment

academic rights that were interfered with when SRU failed to renew his one-year, probationary

teaching contract, and Mrs. Winslow filed false criminal charges against him based upon the

May 18, 2010 incident. (Id. at 21-24.)  These academic rights include: (1) the right to teach

classes at a community college while employed by SRU; (2) Kahan's "teaching rights," such as

setting classroom management and attendance policies, deciding class content, choosing testing

materials, and using library materials; (3) Kahan's right to be on campus when he previously

planned to be away, without Mrs. Winslow reporting his unplanned presence to administration in

an "effort to get him in trouble;" (4) Kahan's academic freedom to complain to Craig about Mrs.

Winslow's criticism of his teaching and refusal to order supplies; (5) Kahan's right not to have

Dean Tsuquiashi-Daddesio and Craig revoke their initial recommendations that his contract be

renewed; (6) Kahan's academic freedom to be evaluated on the basis of academic standards; (7) Kahan's academic freedom to be on campus without prior approval and a campus police escort following the May 18, 2010 incident; and (8) Kahan's academic freedom to teach as a public university professor. (Id.)  Kahan contends that when he exercised these various "academic rights" Mrs. Winslow and Craig "responded with retaliatory action that would cause a person of ordinary firmness not to exercise his First Amendment right." (Id. at 24.)  Later in this opinion the court will address each of the purported "academic rights" asserted by Kahan in support of his First Amendment claim, and will refer to those rights by the numbers listed immediately above at that time.

### a.  <u>Legal Standards</u>

In order to establish a retaliation claim under the First Amendment, a plaintiff must demonstrate: (1) constitutionally protected conduct; (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) a causal link between the constitutionally protected conduct and the retaliatory action. <u>Thomas v. Independence Twp.</u>, 463 F.3d 285, 296 (3d Cir. 2006) (citing <u>Mitchell v. Horn</u>, 318 F.3d 523, 530 (3d Cir. 2003)).  To establish the requisite causal connection, a plaintiff must prove either: (1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. <u>Lauren W. ex rel. Jean W. v. DeFlaminis</u>, 480 F.3d 259, 267 (3d Cir. 2007) (citing decisions).  If such evidence is not available, a plaintiff must show, from "evidence gleaned from the record as a whole," that the trier of fact should infer causation. <u>Id.</u>  If a plaintiff establishes his <u>prima</u> <u>facie</u> case, then the burden shifts to the defendant to prove that the same adverse action would have

been taken in the absence of the protected activity. <u>Springer v. Henry</u>, 435 F.3d 268, 275 (3d Cir. 2006); <u>Hill v. City of Scranton</u>, 411 F.3d 118, 125 (3d Cir. 2005).

The Individual SRU Defendants contend that Kahan cannot prove that he engaged in constitutionally protected conduct, which is a question of law. <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 241 (3d Cir. 2006). The Individual SRU Defendants do not challenge Kahan's ability to prove the second (retaliatory action) or third (causation) elements of his <u>prima</u> <u>facie</u> case. For the purpose of this opinion, the court will presume that the second element can be met because non-renewal of a one-year teaching contract, and being charged with a crime are retaliatory actions sufficient to deter a person from exercising his constitutional rights.[8]

### b. **Constitutionally Protected Conduct**

Kahan makes no argument, and cites no legal authority to establish that his myriad of asserted "academic rights" is protected activity pursuant to the First Amendment. Instead, Kahan recites generally-applicable legal principles to the effect that academic freedom, scholarly debate, and teaching are important First Amendment interests, followed by a haphazard list of various "academic rights" that were allegedly infringed upon when his contract was not renewed and Mrs. Winslow reported the May 18, 2010 incident to the SRU police. (ECF No. 100 (Kahan brief) at 21-24.) These recitations are insufficient to satisfy Kahan's burden to prove that he engaged in constitutionally protected activity.

---

[8] The Individual SRU Defendants also do not challenge that Mrs. Winslow acted in her capacity as an SRU employee when she reported the May 18, 2010 incident to the SRU campus police, thus qualifying her as a state actor. As set forth above in section III.B., the court will presume for the purpose of this opinion that this essential element of all § 1983 claims has been met in this case.

The court nonetheless independently considered each of Kahan's asserted academic rights in order to determine whether any could possibly form the basis of a viable § 1983 claim. This task is particularly generous to Kahan because in Kahan's second amended complaint the First Amendment claim is grounded only on the pressure placed upon Kahan to change Tommy Winslow's grade and to give him more time to complete his final report. (ECF No. 53 ¶¶ 181-84.) Kahan does not even include these two items on his list of alleged "academic rights" in his brief in opposition to the motion for summary judgment, and does not include the myriad of "academic rights" relied upon in his opposition brief in his second amended complaint. Putting this aside, and in order to provide Kahan, the nonmovant, the benefit of any possible doubt or factual dispute, the court evaluated every one of the alleged academic rights and freedoms mentioned in Kahan's summary judgment briefing to determine whether a cognizable First Amendment claim based thereon could be sustained. The court concludes that Kahan is unable to establish that he engaged in any conduct protected by the First Amendment, and that judgment must be entered in favor of the Individual SRU Defendants and against Kahan on his free speech § 1983 claim.

Kahan does not personally hold a First Amendment "teaching right" concerning classroom management, class content, student conduct, and use of testing materials. A teacher's "in-class" conduct concerning what may be taught and how it will be taught is not protected by the First Amendment. Borden v. Sch. Dist. of the Twp. of East Brunswick, 523 F.3d 153, 171-72 & n.14 (3d Cir. 2008) ("it is the educational institution that has a right to academic freedom, not the individual teacher"); Brown, 247 F.3d at 74-75 ("in the classroom, the university was the speaker and the professor was the agent of the university for First Amendment purposes"); Edwards v. California Univ. of Pa., 156 F.3d 488, 491-92 (3d Cir. 1998) (professor has no First

Amendment right to his choice of curriculum materials and the content of his classes); Bradley, 910 F.2d at 1176 (in-class conduct is not protected by the First Amendment). The "academic right" listed as item 2 above does not qualify as constitutionally protected speech, and cannot support a § 1983 claim. See supra Sec. III.B.2 (listing items 1 through 8).

Kahan's asserted "academic rights" concerning the evaluation process that resulted in the non-renewal of his contract, items 5 and 6, are likewise not cognizable under the First Amendment. Describing the evaluation process as an "academic freedom" does not change its essential contractual-based character. The standards, procedures, and deadlines by which Kahan's renewal was decided were set by the CBA. Kahan makes no allegation that the CBA itself contained provisions that violated his First Amendment rights, and fails to offer any explanation about how his supervisors' reliance on missed deadlines to justify reversing their decision about renewing his contract implicate his free speech rights. To the extent Kahan contends that the evaluation process was used a ruse to retaliate against him for complaining to Craig about how Mrs. Winslow was treating him, as will be discussed immediately below, Kahan's complaint does not itself meet the requirements of constitutionally protected speech, making such a claim spurious. Items 5 and 6 do not qualify as constitutionally protected speech, and cannot support a § 1983 claim.

The complaints by Kahan to Craig about Mrs. Winslow, item 4, do not rise to the level of constitutionally protected speech, because they were not made by a public employee acting in his capacity as a citizen and did not involve matters of public concern. Garcetti v. Ceballos, 547 U.S. 410, 418 (2006); Gorum v. Sessoms, 561 F.3d 179, 185-87 (3d Cir. 2009). Such complaints, made to superiors "up the chain of command" do not qualify as "protected activity." Morris v. Phila. Housing Auth., 487 F.App'x 37, 39 (3d Cir. 2012). Governmental

officials enjoy wide latitude in managing their offices when employee expression cannot be fairly characterized as relating to a matter of political, social, or other concern to the community. Connick v. Myers, 461 U.S. 138, 146 (1983). Speech concerning disputes between individual employees does not add to the debate on matters of public importance and does not enjoy First Amendment protection. Borden, 523 F.3d at 169-71; Brown, 247 F.3d at 76-77 (discussing decisions); Roseman v. Indiana Univ. of Pa., 520 F.2d 1364, 1367-69 (3d Cir. 1975) (finding that professor's complaint to dean and at a faculty meeting about a fellow employee's alleged suppression of another employee's application for chairmanship was not protected by the First Amendment).

Kahan's complaints to Craig about Mrs. Winslow being rude and unprofessional, and about being pressured to grant Tommy Winslow an extension of time and to raise his final grade, are not the kind of speech to which the First Amendment applies in the public employee context. This conclusion does not change simply because Kahan prefaces his factual averments with the moniker "academic freedom." Complaints to a supervisor about co-workers being rude, refusing to order supplies, and interfering in classroom management and grading decisions are not constitutionally protected. Item 4 does not qualify as constitutionally protected speech, and cannot support a § 1983 claim.

Kahan provides no legal authority or argument in support of his bald assertion that he has a generalized First Amendment right of access to the SRU campus, which was interfered with when Mrs. Winslow tried to "get him in trouble" for unexpectedly being on campus and when SRU required that Kahan obtain permission or an escort before visiting campus after the May 18, 2010 incident, i.e., items 3 and 7. Even if Kahan established that an unrestricted right of access to the SRU campus was constitutionally protected conduct under the

First Amendment, the assertions made by Kahan do not establish that the right was interfered

with.  By Kahan's own account, he was not barred from being on campus after the May 18, 2010

incident, but only was required to either notify officials that he would be on campus or obtain an

escort while there. See supra Sec. III.A.1(a); (ECF No. 122, SRU CCSMF ¶ 201 (prior

permission required); ECF No. 53 ¶ 70 (escort required).)  Mrs. Winslow's report that Kahan

was on campus, when he previously stated that he would not be on campus, cannot, logically,

interfere with any right of access to campus.  By Kahan's own contention, he was, in fact, on

campus at the time.  By Kahan's own allegations, he was not barred from access to the campus.

Items 3 and 7 cannot support a § 1983 claim.

   Likewise, Kahan's claim that he has a First Amendment right to be a professor at

SRU, a neighboring community college, or at any other academic institution is unsubstantiated.

Without further explanation or support, the court cannot find that Kahan has a generalized

constitutional right to be employed as a college professor.  As a factual matter, even viewed in

the light most favorable to Kahan, the record does not reflect that SRU sought to prevent Kahan

from teaching at the neighboring community college, but only took issue with SRU deadlines

being missed because responsibilities at that other school were being prioritized. (ECF No. 122,

SRU CCSMF ¶ 27.)  It follows that items 1 and 8 do not qualify as constitutionally protected

activity, and cannot support a § 1983 claim.

   Kahan failed to prove that any of the "academic rights" that he asserts qualify as

constitutionally protected conduct.  It follows that Kahan's First Amendment § 1983 claim fails.

Judgment is appropriately entered in favor of the Individual SRU Defendants and against Kahan

on this basis.

### c. __Causal Link__

Although unnecessary, the court nevertheless considered the issue of causation. Kahan is unable to satisfy his burden to prove this element because the entirety of Kahan's evidence in support of causation is unsubstantiated attorney argument that "there is a causal link between [Kahan's] termination and his teaching." (ECF No. 100 (Kahan brief) at 24.) Kahan does not even argue that there is a causal link between the filing of criminal charges stemming from the May 18, 2010 incident, and a purported interference with his alleged academic rights. This is insufficient to meet Kahan's burden to establish causation. The court also notes that Kahan's causation arguments would suffer from, at least, the same deficiencies noted in this court's prior discussion of the causation element with respect to Kahan's Title VII retaliation claims. See supra Sec. III.A.3.

The court, however, acknowledges that the Individual SRU Defendants did not challenge Kahan's § 1983 First Amendment claim on the ground that he failed to prove causation. This makes Kahan's failure to produce evidence in support of the causation element of his prima facie case understandable. The causation element is not dispositive, however, because Kahan is unable to establish that he engaged in constitutionally protected activity. On this basis alone, the court will enter judgment in favor of the Individual SRU Defendants and against Kahan on Count VI.[9]

---

[9] Although neither party addresses this issue, even if Kahan could establish a prima facie case of retaliation, SRU could still ultimately prevail by proving that it would have made the same decision not to renew his contract and to file assault charges against him in the absence of Kahan's constitutionally protected activity. Springer, 435 F.3d at 275; Hill 411 F.3d at 125. This issue is not before the court, but could provide an alternative basis for entry of judgment in favor of the Individual SRU Defendants.

### 3. **The Due Process Claims (Counts VII and VIII)**

The Individual SRU Defendants move for summary judgment on Kahan's § 1983 due process claims on various grounds. (ECF No. 78 (SRU brief) at 15-17.) While noting that Kahan's second amended complaint "appear[s] to mix claims of Substantive and Procedural Due Process," the Individual SRU Defendants argue that any substantive due process claims fail because a) even a tenured professor does not hold a fundamental property interest in his job, b) Kahan failed to seek the remedy of a name-clearing hearing, and c) Kahan failed to establish that any defamatory statements were made public in connection with his non-renewal. (Id. at 15-16.) With respect to any procedural due process claim, the Individual SRU Defendants contend that a probationary, tenure-track professor is not entitled to either a pre- or post-termination hearing, but that Kahan, nevertheless received such protections because he was afforded numerous opportunities to discuss his non-renewal with various SRU officials prior to SRU issuing its final decision, and also filed a grievance challenging SRU's decision not to renew his contract. (Id. at 16-17.)

Kahan's sole argument in opposition to the Individual SRU Defendants' motion for judgment as a matter of law on both due process counts is that he produced sufficient evidence to establish a deprivation of his liberty interest in reputation pursuant to the stigma-plus test. (ECF No. 100 (Kahan brief) at 24-26.) Kahan, in opposition to summary judgment, advances no due process claim other than a stigma-plus claim. It is appropriate, on this record, to limit Kahan to his own framing of the issues, and to consider only whether a reasonable jury could find in his favor under the stigma-plus test. The court independently considered the

record, but identified no evidence that would support any other due process claim, whether substantive or procedural.

According to Kahan, the Individual SRU Defendants "created and disseminated a false and defamatory impression about Kahan in connection with his termination" when: (1) Dean Tsuquiashi-Daddesio and Craig reversed their previously favorable recommendations; (2) Mrs. Winslow raised false allegations that Kahan had targeted and harassed her son due to his disability and made a comment about looking at "good-looking men" to him during class; (3) Mrs. Winslow falsely reported to the SRU campus police that Kahan assaulted her; (4) SRU banned Kahan from campus absent an escort; (5) SRU and Mrs. Winslow initiated criminal proceedings against Kahan; and (6) Mrs. Winslow told members of the history department about the May 18, 2010 incident. (Id. at 26.)   Later in this opinion the court will address each of these allegedly false and defamatory statements asserted by Kahan in support of his due process claim, and will refer to these statements by the numbers listed immediately above at that time.

### a.  **Legal Standards**

In the public employment context, a plaintiff may secure relief pursuant to § 1983 based upon a due process liberty interest violation by satisfying the stigma-plus test. Brown v. Montgomery Cnty., 470 F.App'x 87, 91 (3d Cir. 2012) (citing Hill, 455 F.3d at 236).  Under the stigma-plus test, the dissemination of a false and defamatory statement is the stigma. Id.; Lockett v. Pa. Dep't of Corrections, 529 F.App'x 294, 296 (3d Cir. 2013); Graham v. City of Phila., 402 F.3d 139, 142 n.2 (3d Cir. 2005).  To satisfy the stigma prong of the test, the employee must show a) publication of b) a substantially and materially false statement that c) infringed upon the reputation, honor, or integrity of the employee. Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 573 (1972); Brown, 470 F.App'x at 91; Ersek v. Twp. of Springfield, 102 F.3d 79, 83–

84 (3d Cir. 1996). No liberty interest of constitutional significance is implicated when the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty or malfeasance. Fox v. Cheltenham Twp. Auth., No. 12–716, 2012 WL 2273424, at * 4 (E.D. Pa. Jun. 18, 2012) (citing Mercer v. City of Cedar Rapids, 308 F.3d 840, 845 (8th Cir. 2002)); see Chinoy v. Pa. State Univ., No. 11–1263, 2012 WL 727965, at * 5 (M.D. Pa. Mar. 6, 2012) (same); Kohn v. Sch. Dist. Of City of Harrisburg, 817 F.Supp.2d 487, 498 (M.D. Pa. 2011) (same). Publication must be to the general public; comments made to officials within the same public institution do not qualify as public dissemination. Yu v. U.S. Dep't of Veterans Affairs, 528 F.App'x 181, 185 (3d Cir. 2013).

The plus prong is typically termination of employment, but reputational damage that occurs "in the course of or is accompanied by a change or extinguishment of a right or status guaranteed by state law or the Constitution" is actionable. D & D Assoc., Inc. v. Bd. of Educ. of N. Plainfield, 552 F.App'x 110, 113 (3d Cir. 2014) (citing Clark v. Twp. of Falls, 890 F.2d 611, 619 (3d Cir. 1989)); Lockett, 529 F.App'x at 296; Brown, 470 F.App'x at 91. Although deprivation of the "liberty to pursue a calling or occupation" or to "earn a living" have been deemed sufficient to satisfy the plus prong, a generalized "possible loss of future employment opportunities," and "financial harm" are insufficient to support a reputation-based due process claim. Simpson v. Nicklas, 500 F.App'x 185, 188 (3d Cir. 2012) (citing Clark, 890 F.2d at 620, and Sturm v. Clark, 835 F.2d 1009, 1013 (3d Cir. 1987)); Thomas, 463 F.3d at 297; Hill, 455 F.3d at 232-33; see Arneault v. O'Toole, 513 F.App'x 195, 198-99 (3d Cir. 2013) (loss of possible business prospects by being required to disclose an unfavorable fact on future applications does not satisfy the plus prong).

Finally, there must be a sufficient causal connection between the allegedly stigmatizing statements, and the loss of the constitutionally protected right or status in order to qualify for relief under the stigma-plus test. <u>D&D Assoc.</u>, 552 F.App'x at 114. When this claim is proven, the appropriate remedy is a post-termination name-clearing hearing.[10] <u>Roth</u>, 408 U.S. at 573 & n.12; <u>Brown</u>, 470 F.App'x at 91; <u>Ersek</u>, 102 F.3d at 83-84.

### b. **Stigma Prong**

In order to satisfy the stigma prong of the stigma-plus test, Kahan must produce sufficient evidence that a substantially and materially false statement was made publicly, that infringed upon his reputation, honor, or integrity. <u>Roth</u>, 408 U.S. at 573; <u>Brown</u>, 470 F.App'x at 91; <u>Ersek</u>, 102 F.3d at 83–84.

There is no dispute that statements 1, 2, and 6 were not publicly made. <u>See</u> <u>supra</u> Sec. III.B.3 (listing statements 1 through 6). Dean Tsuquiashi-Daddesio's and Craig's recommendation reversals (statement 1) were administrative communications, internal to SRU staff members. Such communications are not public as a matter of law. <u>Yu</u>, 528 F.App'x at 185.

---

[10] The Court of Appeals for the Third Circuit has not yet decided whether a plaintiff who prevails on a stigma-plus claim may be entitled to remedies other than a name-clearing hearing. <u>Hill</u>, 455 F.3d at 236 nn.15, 19; <u>Graham v. City of Phila.</u>, 402 F.3d 139, 144 (3d Cir. 2005) (finding that plaintiff was entitled to no relief because a criminal trial satisfied the name-clearing hearing requirement of the Due Process Clause); <u>but</u> <u>see</u> <u>Ersek</u>, 102 F.3d at 84 n.6 (noting that a name-clearing hearing might be insufficient to cure all the harm caused by stigmatizing government comments in certain circumstances); <u>see</u> <u>also</u>, <u>Dean v. City of Coatesville</u>, No 09-4399, 2010 WL 1005142, at * 4 (E.D. Pa. Mar. 17, 2010) (noting that most district courts within the jurisdiction of the Court of Appeals for the Third Circuit, and the Courts of Appeals for the Fourth and Fifth Circuits, have held that a plaintiff must have requested a name-clearing hearing to proceed on a stigma-plus due process claim); <u>but</u> <u>see</u> <u>Greene v. Street</u>, No 10-4529, 2011 WL 208382, at * 5-6 (E.D. Pa. Jan. 20, 2011) (noting that <u>Hill</u> can be read as implying that the Court of Appeals for the Third Circuit will not require that a plaintiff establish that he previously requested a name-clearing hearing). Because Kahan's stigma-plus claim otherwise fails, the court need not reach this issue.

Mrs. Winslow's communications to the history department staff (statement 6) do not qualify as public statements for the same reason. Id. Mrs. Winslow was advised to make these statements to co-workers in order to explain why her door would be closed or locked in the future while she was in her office working. (ECF No. 122, SRU CCSMF ¶¶ 196-97; ECF No. 101-11 at 5-6, 7, and 11 (Mrs. Winslow depo. at 37-38, 39, and 44.)

Mrs. Winslow's statements concerning Kahan harassing Tommy Winslow due to his disability and the "good-looking man" comment (statement 2) were not publicly made. The record reflects that Mrs. Winslow made statements of this nature to Quidone and McCoy in December 2009 while attempting to obtain an extension of time for her son, to Dean Tsuquiashi-Daddesio during a March 19, 2010 in-person meeting, and to Craig in her March 21, 2010 complaint letter. See supra Sec. III.A.2(b). Such communications among SRU employees are not public statements. Yu, 528 F.App'x at 185. There is no evidence that anyone outside of SRU was privy to these conversations, and documents. In fact, Kahan indicates that he was unable to obtain his own copy of Mrs. Winslow's March 21, 2010 complaint letter until after this lawsuit was filed. (ECF No. 122, SRU CCSMF ¶¶ 170, 185-87.) No reasonable jury could conclude that Mrs. Winslow's complaints about Kahan were publicly made.

Although statement 1 cannot form the basis of a stigma-plus claim because it was not made publicly, the court additionally notes that, as a matter of law, the reversal of Dean Tsuquiashi-Daddesio's and Craig's recommendations are not substantially and materially false statements. The record reflects that the only reasons given for these revised recommendations were Kahan's failure to meet deadlines and attend to professional duties. (ECF No. 80-3 at 28-29 (Craig memo to Dean); ECF No. 105-2 at 45 (Craig memo to evaluation committee); ECF No. 80-3 at 31 (Dean memo to Provost Williams).) Kahan acknowledges in nearly contemporaneous

correspondence that he submitted his mid-term grades late in both semesters, was tardy in submitting student attendance sheets (the "salmon-colored sheets"), and missed a faculty meeting. (ECF No. 80-3 at 39-41 (Kahan memo to Provost Williams).) Kahan's contract was not renewed because he admittedly missed deadlines, making it impossible for any reasonable jury to find that the statements made by Dean Tsuquiashi-Daddesio and Craig about his failure to meet deadlines were false.[11] In any event, an employer's allegations of improper or inadequate performance, incompetence, neglect of duty or malfeasance are not actionable under the stigma-plus test. Fox, 2012 WL 2273424, at * 4. Kahan's due process claim cannot be based upon statements 1, 2, or 6.

Kahan's due process claim can also not be based upon statement 4, i.e., the letter directing Kahan not to return to campus without prior permission or an escort. (ECF No. 122, SRU CCSMF ¶ 201 (prior permission required); ECF No. 53 ¶ 70 (escort required).) Kahan does not allege that the letter, or the directive contained in it, was made known to anyone other than Kahan. It is impossible, based upon this record, which as the court has noted previously does not include a copy of this letter, for Kahan to establish that a substantially and materially false statement was made publicly about Kahan in, or in connection with, that letter. Kahan's due process claim cannot be based upon statement 4.

---

[11] Although earlier drafts of Dean Tsuquiashi-Daddesio's and Craig's memoranda reference Mrs. Winslow's complaint letter, and Kahan's perceived problematic personality traits, which statements could possibly be proven false, these drafts were only exchanged between Craig and the Dean, and were not included in Kahan's personnel file, conveyed to other SRU officials to justify non-renewal, or included in Kahan's final non-renewal letter, and were not publicly disseminated. (ECF No. 80-3 at 28-29 (Craig memo to Dean); ECF No. 105-2 at 45 (Craig memo to evaluation committee); ECF No. 80-3 at 31 (Dean memo to Provost Williams); ECF No. 80-3 at 35 (President Smith letter).)

The only statements remaining that could possibly satisfy the stigma prong are Mrs. Winslow's allegedly false report of the May 18, 2010 incident to SRU campus police, and SRU's and Mrs. Winslow's initiation of criminal proceedings against Kahan as a result of that incident, i.e., statements 3 and 5. The court will presume, for the purpose of this opinion only and without deciding, that these statements were publicly made, were false, and damaged Kahan's reputation, this satisfying the stigma prong of a stigma-plus due process claim.

### c. **Plus Prong**

Kahan asserts that he suffered two kinds of damage that satisfy the plus prong of his due process claim: 1) his "termination;" and 2) his inability to secure full-time employment. (ECF No. 100 (Kahan brief) at 25-27.) The court concludes that Kahan is unable to satisfy the plus prong of his due process claim on either basis.

The allegedly stigmatizing statements made by Mrs. Winslow, and SRU, about the May 18, 2010 incident were made seven weeks after SRU decided not to renew Kahan's contract. (ECF No. 80-3 at 35 (President Smith letter).) From the standpoint of simple chronology, those statements could not have caused his contract not to be renewed. D&D Assoc., 552 F.App'x at 114; Clark, 890 F.3d at 619. Kahan's attempt to create a causal link by delaying the date of his alleged "termination" based upon the argument that his grievance was ongoing when Mrs. Winslow falsely accused him of verbally and physically assaulting her on May 18, 2010 is deficient on two fronts. First, Kahan's grievance was denied by Provost Williams in a letter dated May 11, 2010, which is one week before the alleged altercation with Mrs. Winslow. (ECF No. 80-4 at 2 (grievance denial).) Second, Kahan's grievance was not a substantive review of the reasons for his non-renewal. Instead, pursuant to the CBA, the only issue that Kahan was entitled to grieve was whether he received notice of his non-renewal by April 1, 2010, which he

did. (Id.)  Even if Kahan's grievance was open at the time of the May 18, 2010 incident, which it was not, Mrs. Winslow's report to SRU campus police could have no possible effect on whether or not Kahan received notice of his non-renewal by the April 1, 2010 deadline.  No reasonable jury could find a causal link between Kahan's non-renewal (which Kahan refers to as his "termination") and Mrs. Winslow's incident report to the SRU campus police, and the resulting criminal charges, under these circumstances.

Kahan's contention that he has been unable to secure full-time employment as a result of the May 18, 2010 incident, likewise, cannot satisfy the plus prong of his due process claim.  Kahan's primary evidence  in support of this contention is that the disclosure of the criminal charges was a factor in him not getting a job with the California State Parks Association. (ECF No. 100 (Kahan brief) at 25 (citing ECF No. 112, SRU CCSMF ¶ 210); accord ECF No. 109-7 at 2-17 (Kahan decl.) ¶ 109.)  Kahan cites only to his own deposition testimony in support of this factual averment.  That testimony reads as follows:

> Q: When you have filled out employment applications, you do not feel that you need to make references to these charges?
>
> A:  It depends on the question that's asked.  When I applied for work with the California State Parks Association, I felt the need to address that issue because they had a question on the application that specifically asked about it.
>
> Q: Well, how did it – was it phrased; if you know?
>
> A: I don't recall, but it specifically required that I note this.
>
> Q: Have you noted this on any other applications for employment?
>
> A: I can't recall at this time.

(ECF No. 210, SRU CCSMF ¶ 210, citing Kahan Depo. at 237; accord ECF No. 109-7 at 2-17 (Kahan decl.) ¶ 109.)  Kahan does not cite to, or include, the testimony immediately preceding this exchange, and the attorney asked no further questions after this exchange.  Kahan provides

no details concerning when he applied for this job, what job he was applying for, whether the job was full-time, whether he was interviewed for the job, who was hired for the job, or why he was not hired for the job. This testimony fails to establish that the California State Parks Association refused to hire Kahan because Mrs. Winslow accused him of assaulting her on May 18, 2010, and initiated criminal charges based upon that purported assault.

Putting aside these factual deficiencies, even if Kahan could establish that the California State Parks Association refused to hire him because Mrs. Winslow accused him of assaulting her on May 18, 2010, resulting in criminal charges being filed against him, Kahan's due process claim would still fail. Kahan's own contention is that he can satisfy the plus prong of his due process claim by establishing that he has been unable to secure full-time employment; no reasonable jury could reach that conclusion based only upon proof that one employer refused to hire Kahan. As is evidenced by the entirety of the record, which the court reviews in detail immediately below, there is no other basis on which a reasonable jury could reach that conclusion. The record, instead, contradicts a finding that Kahan has been unable to secure full-time employment because Mrs. Winslow reported the May 18, 2010 incident to the SRU campus police, causing the campus police to file criminal charges against him.

Although Kahan fails to cite in support of his due process claim the factual averment he made in paragraph 209 of his counterstatement of material facts, the court independently reviewed it, and the supporting evidence, as that paragraph also speaks to Kahan's alleged inability to "secure full-time employment despite tremendous job search efforts" since 2010. (ECF No. 122, SRU CCSMF ¶ 209, citing Kahan Depo. at 26-29 (ECF No. 101-1 at 8-11); accord ECF No. 109-7 at 2-17 (Kahan decl.) ¶ 108.) Paragraph 209 cites to only four pages of Kahan's own deposition testimony, which testimony generally summarizes his efforts to obtain

employment. (Id.)  Kahan did not provide the court with the entirety of this line of questioning during his deposition, but both Tommy Winslow and Mr. Winslow submitted the nine pages preceding the pages to which Kahan cites to support their factual averment that "by Plaintiff's own testimony he has been employed by institutions of post-secondary learning since his departure from Slippery Rock University." (ECF No. 118 ¶ 143 and -1; ECF No. 119 ¶ 134 and -1.)

This deposition testimony indicates that although Kahan has not yet obtained a tenure track faculty position, he has taught classes at five on-line universities or colleges, taught three classes per semester at Ohlone College in Fremont, California, developed curriculum for the Saylor Foundation, and worked full-time for the California Association of Drug and Alcohol Counselors doing accounts payable work. (ECF No. 118-1 at 2-9 (Kahan depo. at 17-24).) According to Kahan, he voluntarily quit this full-time job in order to prevent his student loans from entering repayment. (Id. at 10-11 (Kahan depo. at 25-26).)  The remainder of this deposition testimony, which is the portion to which Kahan cites in support of his factual allegation that he "has been unable to secure full-time employment despite tremendous job search efforts," generally discusses his job-searching techniques and filing system. (ECF No. 101-1 at 8-11 (Kahan depo. at 26-29).)  When specifically asked during this exchange whether he had been requested to disclose the criminal charges initiated by Mrs. Winslow on any applications for professorships, Kahan testified "I don't know.  I believe so," but acknowledged that no responses from any of the universities touched on or discussed the criminal charges. (Id. at 11 (Kahan depo. at 29).)  No reasonable jury could find, based upon this evidence, that Kahan has been unable to obtain full-time employment because of the accusations Mrs. Winslow made about him, or the criminal charges that resulted therefrom.

Kahan cannot establish, even assuming for the sake of argument that the statements about the May 18, 2010 incident satisfy the stigma prong, that he suffered reputational damage "in the course of" or that was "accompanied by a change or extinguishment of a right or status guaranteed by state law or the Constitution" under the plus prong. D & D Assoc., 552 F.App'x at 113. The non-renewal of his contract in March 2010 could not have been caused by statements made about the May 2010 incident. The record does not support any reasonable inference that Kahan has been deprived of full-time employment because of statements made about the May 2010 incident. It follows that no reasonable jury could return a verdict in favor of Kahan on his stigma-plus due process claim.

Because the only due process claim asserted by Kahan in opposition to the Individual SRU Defendants' motion for summary judgment is a stigma-plus claim, Kahan's due process-based § 1983 claim fails. Judgment is appropriately entered in favor of the Individual SRU Defendants and against Kahan on Counts VII and VIII.

### C. **The State Law Claims**

After judgment is entered as set forth above, only five claims remain, all of which seek relief pursuant to Pennsylvania law. Counts X and XI are companion PHRA claims, which are asserted against Dean Tsuquiashi-Daddesio and Craig. See supra note 1; (ECF No. 53 at Counts X and XI.) Count XII is a Pennsylvania statutory defamation claim asserted against Mrs. Winslow and Tommy Winslow. (Id. at Count XII.) Counts XIII and XV are Pennsylvania common law claims of promissory estoppel and malicious prosecution asserted against Dean Tsuquiashi-Daddesio and Craig. (Id. at Counts XIII and XV.) Count XIV is a Pennsylvania common law claim of intentional interference with contract asserted against Dean Tsuquiashi-

Daddesio, Craig, Mrs. Winslow, and Mr. Winslow. (Id. at Count XIV.)  No federal claims survive summary judgment.

A district court may decline to exercise supplemental jurisdiction where the federal claims are no longer viable. 28 U.S.C. § 1367(c)(3); Trinity Indus., Inc. v. Chicago Bridge & Iron Co., 735 F.3d 131, 135 (3d Cir. 2013).  The decision with respect to whether to exercise supplemental jurisdiction under these circumstances is within the district court's discretion, and factors such as when the federal claims are removed from the case, and under what circumstances, are relevant. 28 U.S.C. § 1367(c)(3), cmt. (1988) (Discretionary Rejection of Supplemental Jurisdiction); Growth Horizons, Inc. v. Delaware Cnty., Pa., 983 F.2d 1277, 1284-85 (3d Cir. 1993) (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966)).  The Court of Appeals for the Third Circuit has held that, where all federal claims are dismissed before trial, "the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000) (citations omitted).

In this case, the only remaining claims are asserted under state common and statutory law. (ECF No. 53 at Counts X-XV.)  With the exception of Kahan's PHRA claims, which this court addressed above in footnote one, Kahan's state claims sound in tort, and do not overlap with the federal claims disposed of in this opinion.  There is no federal interest in deciding those state-based claims, and judicial economy, convenience, and fairness are not served by this court, instead of the state court, resolving this case.  Should Kahan chose to pursue his state law claims in state court, that court will have the benefit of this opinion, and of the extensive summary judgment filings already prepared by the parties with respect to the state

claims, should it chose to proceed directly to determining whether the case can be decided as a matter of law. Should there be issues that require determination by a fact-finder, there is no interest in this federal court conducting a trial on exclusively state-law claims.

## IV.    CONCLUSION

For the foregoing reasons, judgment will be entered in favor of the SRU Defendants, and against Kahan, with respect to Counts I-VII and XVI- XVII. Counts X-XV are dismissed without prejudice to Kahan's right to pursue those claims in state court. Count IX was previously dismissed, and was omitted from Kahan's second amended complaint. (ECF No. 53 at 24.)

An appropriate order will be filed contemporaneously with this opinion, and this case will be closed.


Date: September 24, 2014                                    BY THE COURT:


                                                            /s/ *Joy Flowers Conti*
                                                            Joy Flowers Conti
                                                            Chief United States District Judge